## HAMILTON *v.* UNITED STATES.*

CRIMINAL LAW; COMMON LAW IN FORCE IN DISTRICT OF COLUMBIA; MURDER; INDICTMENT; EXPERT TESTIMONY; VARIANCE; PRAYERS FOR INSTRUCTION.

1. The common law of crimes and of criminal procedure, as it existed in

---

*Insanity—Expert Evidence as to.*—The authorities dealing with the various questions involved in the subject of expert and non-expert opinions

D. C.]                                    Syllabus.

Maryland in 1801, is still in force in the District of Columbia, except as modified or repealed by statutory provision. (Following *Hill* v. *United States*, 22 App. D. C. 395.)

2. The definition of murder in D. C. Code, sec. 798 [31 Stat. at L. 1321, chap. 854], is declaratory of the common law, and is not a new or statutory definition.

3. An indictment for murder under D. C. Code, sec. 798, is not defective for want of an express allegation of an intent to kill. (Following *Hill* v. *United States, supra.*)

4. An indictment for murder under D. C. Code, sec. 798, which charges that the defendant did "choke, suffocate and strangle" a certain person, "of which said choking, suffocating, and strangling" the said person died, is sufficient, although there is no allegation that the choking was "mortal."

5. A medical student who has attended lectures on mental diseases is not competent to testify as an expert on insanity.

6. Whether a witness is shown to be qualified to testify as an expert is a matter in the discretion of the trial court, and its ruling thereon will not be reversed unless manifestly erroneous. (Following *Bradley* v. *District of Columbia*, 20 App. D. C. 173; *Raub* v. *Carpenter*, 17 App. D. C. 514; *Lansburgh* v. *Wimsatt*, 7 App. D. C. 271.)

7. A practising physician, who has made a study of mental disorders, with an average of fifteen cases of insanity each year, and who has had a certain person constantly under observation for almost a year, is competent to testify as to that person's mental condition.

8. The proof of the means of commission of a homicide need not conform strictly to the averment of such means in the indictment, provided the means of death proved agree in substance with the means charged.

9. It is not error to refuse a prayer for an instruction predicated on a certain state of facts when there is no evidence whereon to found the prayer.

No. 1616. Submitted December 8, 1905. Decided December 12, 1905.

HEARING on an appeal by the defendant from a judgment and

---

as to sanity or insanity, including the qualifications of an expert witness with regard to such subject, are collated and discussed in the following editorial notes: Note to *Burt* v. *State*, 39 L. R. A. 305, dealing with the subject of expert opinions as to sanity or insanity, and note to *Ryder* v. *State*, 38 L. R. A. 721, dealing with the subject of nonexpert opinions as to sanity or insanity.

sentence of the Supreme Court of the District of Columbia upon a verdict finding him guilty of murder in the first degree.

*Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Levi H. David* for the appellant.

*Mr. D. W. Baker,* United States Attorney for the District of Columbia, and *Mr. Charles H. Turner* and *Mr. Jesse C. Adkins,* Assistants, for the appellee.

Mr. Justice McComas delivered the opinion of the Court:

The appellant, William W. Hamilton, was indicted for the murder of Mary Elizabeth Butler, otherwise known as Lizzie Lyman, and was tried and convicted of murder in the first degree. A motion in arrest of judgment was overruled, and the appellant was sentenced to be hanged, by the supreme court of this District, and he has taken this appeal.

1. The appellant assigns as error that the court below erred in overruling the motion in arrest of judgment, because the indictment fails to legally charge the crime of murder in the first degree; because: First, the indictment fails to charge that the killing was done with intent to kill; second, the indictment fails to allege that the choking, suffocating, and strangling wherefrom it is averred that Mary Elizabeth Butler, known as Lizzie Lyman, "then and there instantly died," was "mortal."

The Code (sec. 798), declares: "Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating, or in attempting to perpetrate, any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree." [31 Stat. at L. 1321, chap. 854.]

This court, in *Hill* v. *United States,* 22 App. D. C. 395, 401, decided that the common law of crimes as it existed in the State of Maryland in 1801, was declared to be in force in this

District by the act of Congress of February 27th, 1801, and that it has remained in force here ever since. By express provision, it is retained and made to coexist with the provision of the Code in all respects, except where it has been repealed or modified by statutory provision. The common-law procedure in all matters relating to crime was in force at the date of the cession of this District by the State of Maryland, and still continues in force here, except in all cases where special provision is made by statute to the exclusion of the common-law procedure. All crimes, therefore, and other appropriate and settled forms of procedure for enforcement, known to the common law, except as otherwise provided by statute, are still in force in this District.

The definition of murder in section 798 of the Code is the common-law definition of the crime. It is not, therefore, a new or statutory definition. The indictment upon which the appellant was tried and convicted, which is in the common-law form, is as follows:

"That one William W. Hamilton, late of the District aforesaid, on the twentieth day of June in the year of our Lord one thousand nine hundred and four and at the District aforesaid, with force and arms in and upon a certain Mary Elizabeth Butler, otherwise called Lizzie Lyman, in the peace of God and of the United States then and there being, feloniously, purposely, and of his deliberate and premeditated malice did make an assault, and that he, the said William W. Hamilton, with both the hands of him, the said William W. Hamilton, about the neck of the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, and her the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, then and there feloniously, purposely, and of his deliberate and premeditated malice did choke, suffocate, and strangle; and that the said William W. Hamilton, a certain necktie about the neck of her the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, then and there feloniously, purposely, and of his deliberate and premeditated malice did fix, tie, and fasten, and that the said William W. Hamilton with the necktie aforesaid, the neck of her, the said Mary Elizabeth But-

ler, otherwise called Lizzie Lyman, then and there feloniously, purposely, and of his deliberate and premeditated malice did further choke, suffocate, and strangle; of which said choking, suffocating, and strangling of the neck of her the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, by both of the hands of him the said William W. Hamilton, as well as by the said necktie, she, the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, then and there instantly died.

"And so the grand jurors aforesaid, upon their oath aforesaid, do say, that the said William W. Hamilton, the said Mary Elizabeth Butler, otherwise called Lizzie Lyman, in the manner and by the means aforesaid, then and there, feloniously, purposely, and of his deliberate and premeditated malice did kill and murder; against the form of the statute in such cases made and provided, and against the peace and government of the United States."

The appellant insists that this indictment merely charges that the defendant feloniously, purposely, and of his deliberate and premeditated malice made an assault upon Mary Elizabeth Butler, and with both hands choked, suffocated, and strangled her, and with a necktie further choked, suffocated, and strangled her, of which choking, suffocating, and strangling of the neck of her, by both of the hands of him, as well as by said necktie, she instantly died. The appellant insists that the indictment fails to charge that the defendant feloniously, purposely, and of his deliberate and premeditated malice killed Mary Elizabeth Butler; and that the intent to kill must be so directly averred to constitute this a legal indictment for murder in the first degree.

The class of cases supporting the appellant's contention appears to be decisions of States in which there are no crimes or misdemeanors by the common law. In Ohio, for instance, "there are no crimes or misdemeanors by the common law." *Fouts* v. *State*, 8 Ohio St. 111.

In the same case it is said (p. 112): "It may therefore be assumed as well settled that murder, in Ohio, is different from murder by the common law of England, not simply in the fact of the two degrees into which it is divided, but especially and

most essentially in the fact that *a purpose or intent to kill* is made by the statute an essential and distinguishing feature in murder, both of the first and also of the second degree. It follows that an indictment for murder, under the statute of this State, must contain a direct averment of *a purpose or intent to kill*, in the description of the crime charged."

And further (p. 115) : "This, however, not being the case in murder at common law, the form of the indictment for murder in England, and in those states in which the statutes have simply adopted the common-law definition of murder, very properly omits a direct charge of a purpose or intent to kill, as a part of the overt act alleged as the crime."

So, in Iowa, where it is held essential to allege that the killing of the deceased was wilful, deliberate, and premeditated, the court remarked that in Iowa there are no common-law crimes, and the Criminal Code is entirely statutory. *State v. McCormick*, 27 Iowa, 409.

In *State v. Watkins*, 27 Iowa, 418, it is said: "Since our statute has narrowed the field of murder punishable with death (murder in the first degree) and excluded therefrom certain homicides, which were murder at the common law, an indictment for murder at common law would not necessarily include the charge of murder in the first degree under our statute; for murder at the common law may have been committed without the wilful, deliberate, and premeditated *intent to kill*, required by our statute to constitute murder in the first degree."

On the other hand, Mr. Wharton (1 Wharton, Crim. Law, 10th ed. sec. 393) says: "Under the statutes a common-law indictment for murder is sufficient to sustain a verdict of guilty of murder either in the first or the second degree. It being held, as has already been seen fully, that the line separating murder from manslaughter is in no way changed by our statutes; and it being further seen that murder in the second degree is simply murder at common law, with certain aggravating features discharged, it follows that on a common-law indictment for murder a verdict of murder either in the first or in the second degree

can be sustained. So, indeed, have our courts in many instances ruled."

And Mr. Wharton concludes that it is no more reasonable to require "a specific intention to take life" to be specially averred, than it is to require "sanity" to be specially averred.

Pennsylvania was the first State to make the statutory distinction between the degrees of murder, and the statute has been reproduced in a majority of the States of the Union, and substantially appears in our Code.

In Maryland (*Davis* v. *State,* 39 Md. 381) the court, reciting the States which have enacted laws distinguishing murder at common law by degrees, says, speaking of a common-law indictment for murder whereon Davis had been convicted of murder in the first degree: "Upon a review of these statutes in the States first mentioned, and the decisions thereon, Wharton announces that 'it is not necessary, nor is it the practice, to designate the grade of the homicide in the indictment, nor that the killing should be charged to be wilful, deliberate, and premeditated,' etc."

We have examined the indictment in the case of *Hill* v. *United States,* 22 App. D. C. 402, before cited, which indictment was held to be good by this court. It is a common-law indictment for murder in all respects like the indictment in the case before us, except that it describes the instrument in that case, [and] the pistol-shot wound as a "mortal" wound. We hold that the indictment we are now considering, like that in *Hill* v. *United States* is not defective for want of an express allegation of an intent to kill. *Davis* v. *Utah Territory,* 151 U. S. 270, 38 L. ed. 156, 14 Sup. Ct. Rep. 328.

In the case last cited at page 266, at page 155, 38 L. ed., and at page 329, 14 Sup. Ct. Rep., the Supreme Court says: "The crime defined is that of murder. The statute divides that crime into two classes in order that the punishment may be adjusted with reference to the presence or absence of circumstances of aggravation.     *     *     *     As the acts which, under the Utah statute, constitute murder, whether of the highest or lowest degree, constituted murder at common law, it is clear that an indictment

good at common law as an indictment for murder, in whatever mode or under whatever circumstances of atrocity the crime may have been committed, is sufficient for any degree of the crime of murder under a statute relating to murder as defined at common law, and establishing degrees of that crime in order that the punishment may be adapted to the special circumstances of each case. These views are substantially sustained by authority. The earliest legislative enactment in this country by which degrees of murder were established was the Pennsylvania statute of April 22, 1794, 'for the better preventing of crimes,' etc. * * * In the supreme court of Pennsylvania, Chief Justice Tilghman said: 'Now this act does not define the crime of murder, but refers to it as a known offense; nor, so far as it concerns murder in the first degree, does it alter the punishment, which was always death. All that it does is to define the different kinds of murder, which shall be ranked in different classes, and be subject to different punishments. It has not been the practice, since the passing of this law, to alter the form of indictments for murder in any respect; and it plainly appears by the act itself that it was not supposed any alteration would be made.' "

Chief Justice Tilghman in the case here quoted (*White* v. *Com.* 6 Binn. 183, 6 Am. Dec. 443) held good an indictment exactly like the indictment now before us, except that the wound mentioned was characterized as "mortal."

The second objection to the indictment, namely, that the choking which caused the death is not described as "mortal," is not fatal to this indictment.

Mr. Bishop on Directions & Forms, in his note to section 520, 2d ed., says: "The general rule is distinctly and fully established by authority, that the wound or other injury must, in felonious homicide, be alleged to have been 'mortal.' * * * And so, in general, are the precedents. But in these for choking and strangling, and in those for suffocation, the fact is otherwise. * * * I have examined, with reference to it, large numbers of the precedents before me, and I have not found one in which even the word 'mortal' is used."

Mr. Wharton (1 Wharton on Precedents of Indictments & Pleas, 4th ed.), in forms 123, 124, 127, and 128, in alleging murder by strangling and choking, in neither instance describes the strangling and choking as "mortal." Where the murder is averred to have been committed by strangling and stabbing, and again where it is charged to have been committed by choking and beating, the form describes the wounds by stabbing and beating as "mortal," and in the same indictment omit to characterize the choking or strangling as "mortal."

3 Chitty's Criminal Law, 756–767, containing precedents of such indictments for murder, omits to describe the "choking and strangling" as mortal.

In *Rex* v. *Huggins,* 3 Car. & P. 415, Vaughan, Baron, said: "When it is charged that the prisoner 'feloniously, wilfully, and of her malice aforethought,' did wrap up and fold the child in flannel, whereby the child was suffocated, I must understand that to mean a wilful suffocation by those means, which is exactly what is intended to be charged on this inquisition."

In *People* v. *Judd,* 10 Cal. 315, Justice Stephen J. Field summarily disposes of the objection to the indictment for murder, in that it did not allege the wound was "mortal," saying: "The second ground relied upon is frivolous. The allegation that the deceased at the time died of the wound inflicted is a sufficient statement that the wound was mortal."

In the indictment before us, charging that the defendant "did choke, suffocate, and strangle Mary Elizabeth Butler; of which said choking, suffocating, and strangling of the neck of her, she, Mary Elizabeth Butler, instantly died," the objection to the omission of the word "mortal" seems, indeed, frivolous. Apparently the old and approved authors of criminal precedents believed that when one was suffocated or strangled one was dead, and to have believed also that one may be wounded by shooting, stabbing, beating, and bruising, and yet live more than a year and a day; and therefore to characterize *such wounds* as "mortal" was to make a material averment; but when one was choked, suffocated, strangled, one then and there instantly died, and it

was surplusage to allege of such causes of death, necessarily instantaneous, that such were "mortal."

We repeat that when charging such a homicide the accepted books of precedents do not use the word "mortal" as a term of art in the description of murder by strangling, choking, and suffocating. Mr. Bishop found no such forms, and we are aware of no cases which say the word "mortal" is a necessary term of description of murder by choking, strangling, and suffocating, and we conclude that the omission of it in this indictment is not error.

2. The fourth assignment of error was the ruling of the court below refusing to permit William B. Hudson to testify as an expert respecting the mental condition of the appellant on June 20, 1904, the time of the homicide, the witness having first seen him soon thereafter.

Hudson during two years prior to his appearance as a witness had been a hospital steward at the district jail, was then a medical student, and not yet a graduate physician and surgeon. He had attended lectures by Dr. Richardson and Dr. White on the subject of mental diseases. Richardson's lectures and lectures by Dr. Rollins, Hudson heard in the course of lectures to the medical school he was still attending.

The court correctly refused to permit Hudson to testify as an expert concerning the mental condition of the appellant at the time of the homicide. Hudson was not competent to so testify. He was offered for that purpose only. Apart from the incompetency of the witness disclosed by the record, this court has said: "The question as to how much knowledge a witness must possess of a certain science or art in order that his opinion shall be competent evidence 'is a matter which, in the nature of things, must be left largely to the discretion of the trial court, and its ruling thereon will not be disturbed unless clearly erroneous.'" Bradley v. District of Columbia, 20 App. D. C. 173; Chateaugay Ore & Iron Co. v. Blake, 144 U. S. 476, 484, 36 L. ed. 510, 512, 12 Sup. Ct. Rep. 731.

Whether a witness is shown to be qualified to testify to any matter of opinion is always a preliminary question for the

judge presiding at the trial, and his decision thereon is conclusive, unless clearly erroneous as a matter of law. *Inland & Seaboard Coasting Co.* v. *Tolson,* 139 U. S. 559, 35 L. ed. 273, 11 Sup. Ct. Rep. 653, and cases there cited.

The appellate court will not reverse in such a case, unless the ruling is manifestly erroneous. *Congress & E. Spring Co.* v. *Edgar,* 99 U. S. 658, 25 L. ed. 490, and cases there cited; *Raub* v. *Carpenter,* 17 App. D. C. 514; *Lansburgh* v. *Wimsatt,* 7 App. D. C. 271.

The fifth assignment of error was the court's ruling that Dr. D. K. Shute, who has been a practising physician for twenty years, visiting physician at the District jail for ten years, and a year prior to that physician to the Washington Asylum, who testified he had made a study of mental disorders with an average of fifteen cases of insanity under his observation each year, and who had appellant constantly under his observation during almost a year past, and had made five formal examinations of him, was competent to testify as an expert respecting appellant's mental condition. Dr. Shute was clearly competent to testify as an expert in this instance.

"As a general rule, physicians and surgeons of practice and experience are experts upon the question of sanity or insanity, and it is not necessary that they should have made the particular disease involved in the inquiry a specialty, to render their testimony admissible as that of experts." 1 Clevenger, Med. Jur. 546.

Dr. Shute's modest disclaimer of his own competency as an expert is immaterial. That question was for the court to decide, and the court decided correctly upon Dr. Shute's experience as disclosed upon the stand. See *Horton* v. *United States,* 15 App. D. C. 323.

3. The second and third assignments of error are because the court below refused to grant the defendant's fourth and fifth prayers. The fourth prayer required the jury, before finding the defendant guilty, to be satisfied beyond a reasonable doubt that the defendant suffocated the deceased with his hands as well as by a necktie about her neck.

The proof of the means of commission of a homicide need not conform strictly to the averment of such means in the indictment. If the means of death proved agree in substance with that charged, it is sufficient. 1 East, P. C. 341; 1 Greenl. Ev. § 65; *Rex* v. *Culkin,* 5 Car. & P. 121.

In *State* v. *Fox,* 25 N. J. L. 601, it was held that "a variance between the indictment and the evidence as to the instrumental cause of death is not material provided the party is proved to have died the same kind of death   *   *   *   as mentioned in the indictment."

The charge of strangling and choking with hands, and facts in testimony that it was effected by placing a scarf around the neck, constitutes no material variance. *Thomas* v. *Com.* 14 Ky. L. Rep. 288, 20 S. W. 227.

The learned court below properly refused this fourth instruction.

The fifth prayer was likewise properly refused. It repeats the error of the fourth prayer in requiring the jury to find beyond a reasonable doubt that the deceased came to her death in the manner and by the means alleged in the indictment. For the reasons just stated, such restriction would have been improper.

This defective fifth prayer further asked the court to instruct the jury that, "if they find that the defendant delivered a blow to the deceased, and she fell, and said blow produced her death, then their verdict should be not guilty." Had this prayer been asked as a separate instruction, and had it been more carefully worded, its rejection could not have prejudiced the appellant. There was no evidence whereon to found the prayer. The witness, Annie Payne, did testify that she was in the alley way, and the appellant and deceased went into their rooms, where the witness heard them talking, and the next thing was a blow with a fist or stick. There is no evidence of a fall or of injury to deceased by a fall. The officer, Walker, testified that on the day of the homicide the defendant detailed the incidents and said that he, the defendant, threw the deceased down on the floor, put one knee on each side of her, and choked her with his hands

until he thought she was dead. Then he wound a necktie twice around her neck and pulled it as hard as he could, and tied both ends, and he let her lie there an hour or so. This is the only account of the homicide in the case. The coroner who performed the autopsy upon the body of the deceased described the condition of the body to be that of a young and healthy person who had died by strangulation. His opinion was that she died of asphyxiation, and her death was due to a "constriction around the throat by suffocation." There was a slight hemorrhage about the collar bone, which might have been due to a blow, but this was not sufficient to have caused death. The coroner was positive the deceased had been suffocated. The hemorrhage was slight, and, if produced by a blow, it must have been slight. There was no other testimony upon the cause of death and there was no evidence whatever to sustain the instruction asked in the last half of the fifth prayer.

We have disposed of all the questions raised upon this appeal. The charge of the learned court below was just and comprehensive, as well as fair to the appellant.

The judgment and sentence of that court must be affirmed, and it is so ordered.                *Affirmed.*