**Benjamin P. O'CONNOR, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11116.**

District of Columbia Court of Appeals.

Argued Sept. 13, 1978.

Decided Feb. 13, 1979.

---

port his conviction for murder; the trial court erred in instructing the jury that if it found beyond a reasonable doubt appellant had intended, after deliberation and pre-meditation, to kill another person but by accident shot and killed the decedent, it could find appellant guilty of murder as charged; the trial court abused its discretion, and thereby committed reversible error, by refusing to continue the trial after the defense counsel had announced ready and put on three witnesses but was unable to produce his other witnesses because they were not present; and the court's sentencing for the offenses other than murder was in error. We affirm the convictions.

The evidence viewed in a light most favorable to the government was that appellant borrowed a maroon-colored auto from his friend, Eric Jackson, explaining that he anticipated trouble if he encountered a certain person who owed him some money; that maroon car was seen a few hours later pursuing another car and shots were heard being fired; at that time the decedent, who was riding nearby in a newspaper delivery truck, was fatally wounded; a police officer stopped appellant because he was driving a car described as having been the pursuing vehicle at the time the fatal shot was fired; while police questioned appellant on the spot, one of his passengers was observed to enter a house in which appellant's cousin, Donna O'Connor, lived; when she admitted the police soon afterward, they discovered a pistol which she acknowledged had been given to her to hide; subsequent tests showed that the bullet removed from the deceased's body came from this gun and that this gun contained both expended shells and live ammunition; and this gun, registered with the police by its lawful owner, Oscar Jackson, had been stolen from him some six months earlier when his place of business was burglarized.

Thomas W. Farquhar, Washington, D.C., appointed by this court, for appellant.

Noel Anketell Kramer, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., and John A. Terry, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before KELLY, KERN and FERREN, Associate Judges.

KERN, Associate Judge:

Appellant was convicted by a jury of murder in the first degree while armed [1] and several lesser offenses, viz., carrying a pistol without a license and receiving stolen property.[2] He urges on appeal that the evidence adduced was insufficient to sup-

Appellant testified in his own defense that he had obtained the gun that night as a result of intervening in a dispute between two others and disarming one of them who

---

1. D.C.Code 1973, §§ 22–2401, –3202.

2. D.C.Code 1973, §§ 22–3204, –2205.

had drawn the gun. He further testified that persons in the other car had pointed a shotgun at him and he had fired only to protect himself. He had picked up two friends after the shooting incident and before being stopped. The trial court gave an instruction to the jury on self-defense. ·

I

## TRANSFERRED INTENT

■ The first assignment of alleged error concerns the trial judge's decision to allow the government to proceed against appellant on the murder charge on a theory of transferred intent.[3] This doctrine, which derives from common law murder, provides that when a defendant purposely attempts to kill one person but by mistake or accident kills another, the felonious intent of the defendant will be transferred from the intended victim to the actual, unintended victim. 40 C.J.S. *Homicide* § 19 at 865–66. Appellant makes three arguments in contending that the doctrine of transferred intent was improperly invoked in this case. First, appellant asserts that since 1901, when the first District of Columbia Code was adopted, no court in this jurisdiction has adopted the doctrine. Appellant points to the criticism of the doctrine by several legal commentators and argues, therefore, that a doctrine so avoided and so criticized should not be invoked to the detriment of appellant.

Appellant's second argument is that even if this court accepts transferred intent as a part of the District's criminal law, he could at most be convicted only of second-degree murder on this theory. The gravamen of his argument is that transferred intent is a creature of common law and therefore should only be applied to common law murder. First-degree murder, as defined by Section 22–2401 of the Code, is not common

law murder but a crime created by statute and restricted to three narrow classes of killings, none of which includes a typical transferred intent situation. Appellant contends therefore that transferred intent, assuming it is part of District of Columbia law, applies only to second-degree murder contained in D.C.Code 1973, § 22–2403, because that provision was intended to codify common law murder.

Finally, appellant claims that the first-degree murder conviction should be overturned on the ground that the evidence adduced at trial was insufficient to permit a reasonable juror to infer premeditation and deliberation, much less a specific intent to kill anyone. According to appellant, the evidence failed to show that appellant specifically intended to kill the driver and/or passengers of the other car or carried out the shooting with premeditation and deliberation. Those elements being absent, his argument goes, he cannot be guilty of first-degree murder under the doctrine of transferred intent for the killing of the unintended victim, the decedent.

■ As to the claim that transferred intent is not part of the criminal law of the District of Columbia, we are compelled to disagree. First of all, it is beyond dispute that the doctrine of transferred intent is well entrenched in common law. *Gladden v. State,* 273 Md. 383, 390–92, 330 A.2d 176, 180–81 (1974). As early as 1576, the doctrine was set forth as follows in *Reg v. Saunders,* 2 Plowd. 473, 75 Eng.Rep. 706 (1576), quoted in *Gladden, supra:*

"And therefore it is every man's business to foresee what wrong or mischief may happen from that which he does with an ill-intention, and it shall be no excuse for him to say that he intended to kill another, and not the person killed. (c) For if a man of malice prepense shoots an arrow at another with an intent to kill him, and

3. Appellant also claims that he suffered undue prejudice at trial because (1) the court's ruling on transferred intent imposed undue limitations on voir dire questioning concerning the defense of self-defense to be presented at trial, (2) there was a variance between the indictment for first-degree murder and the proof at trial, (3)

the denial of two motions to dismiss (one after the government's opening statement and the other after the government's case-in-chief) was erroneous, and (4) the court's instruction on transferred intent contained an erroneous statement. We conclude these claims are without merit.

a person to whom he bore no malice is killed by it, this shall be murder in him for when he shot the arrow he intended to kill, and inasmuch as he directed his instrument of death at one, and thereby has killed another, it shall be the same offense in him as if he had killed the person he aimed at, for the end of the act shall be construed by the beginning of it, and the last part shall taste of the first, and as the beginning of the act had malice prepense in it, and consequently imported murder, so the end of the act, *viz.* the killing of another shall be in the same degree, and therefore it shall be murder, and not homicide only." 2 Plowd. at 474a, 75 Eng.Rep. at 708.

Since that time, the doctrine has gained wide acceptance in the United States and today it represents the majority position in this country. W. Lafave & A. Scott, Jr., *Criminal Law* § 35 at 252 (1972). It has been noted that

there is a singular unanimity among the decisions to the effect that such a homicide partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been, had the blow fallen upon the intended victim instead of the bystander. Annot., 18 A.L.R. 917, 918 (1922).

The question remains, of course, whether the doctrine forms a part of the criminal law of this jurisdiction and we conclude that it does. D.C.Code 1973, § 49–301, provides that all consistent common law in force in Maryland at the time of the cession of the District of Columbia remains in force as part of the law of the District unless repealed or modified by statute. *Linkins v. Protestant Episcopal Cathedral Foundation,* 87 U.S.App.D.C. 351, 354, 187 F.2d 357, 360 (1951). In 1776, Maryland adopted the common law of England as it then existed. *Gladden v. State, supra* 273 Md. at 389; 330 A.2d at 180. *McGraw v. State,* 234 Md. 273, 275–76, 199 A.2d 229, 230–31, *cert. denied,* 379 U.S. 862, 85 S.Ct. 124, 13 L.Ed.2d 64 (1964); *Lickle v. Boone,* 187 Md. 579, 582, 51 A.2d 162, 163 (1947). Recently the Court of Appeals in Maryland made clear that the English common law at that time, and

hence the Maryland common law, embraced the concept of transferred intent. *Gladden v. State, supra* 273 Md. at 389, 330 A.2d at 180. We conclude that the doctrine of transferred intent was contained at the critical time of Maryland's cession of the District within the body of criminal law for the District of Columbia and so was available for the government to use in its theory of prosecution in the instant case. Accordingly, we hold that the trial court did not err in allowing the government to adopt the doctrine of transferred intent in prosecuting appellant.

■ We likewise reject the argument that since D.C.Code 1973, § 22–2401, creates a crime of first-degree murder separate and distinct from common law murder, transferred intent is not applicable to this statutorily-created crime. This contention runs counter to decisions in this jurisdiction holding the opposite in interpreting that statutory provision. *Bishop v. United States,* 71 U.S.App.D.C. 132, 135, 107 F.2d 297, 301 (1939); *Hamilton v. United States,* 26 App. D.C. 382, 385 (1905).

In *Bishop v. United States, supra,* the United States Court of Appeals for the District of Columbia Circuit gave this construction to § 22–2401:

Under the District of Columbia statute, a homicide committed purposely and with deliberate and premeditated malice is murder in the first degree. A homicide committed with malice aforethought, without deliberation and premeditation, is murder in the second degree. "Malice aforethought" may be shown expressly, or may be "implied" from the commission of the act itself. Although distinction is made in the severity of punishment for the degrees of murder, the statute embodies the substance of murder as it was known to the common law. [*Id.,* 71 U.S. App.D.C. at 135, 107 F.2d at 301.]

Since D.C.Code 1973, § 22–2401, merely codifies the common law definition of first-degree murder rather than fashions a new crime, first-degree murder under this section can be proved on a theory of transfer-

red intent. The fact that Congress has transformed the common law crime of murder into a statutory crime may not be viewed as abrogating or altering any feature of murder at common law in the absence of an express intention on the part of the Congress to do so.

■ We must also reject appellant's third contention concerning transferred intent, *viz.,* that as a matter of law the facts of this case could not provide a reasonable inference of premeditation and deliberation by appellant in his shooting at the occupant of the other vehicle and hence could not constitute an intent on his part to be transferred to his shooting of the innocent bystander, the decedent. The record reveals substantial evidence from which the juror could have made a reasonable inference of these elements of premeditation and deliberation. First, there was the testimony of Eric Jackson that appellant expressed an anticipation of trouble on the night in question if he encountered a person who owed him money. Second, the jury could infer that the exchange by appellant of his car for Jackson's was to avoid detection by the person whom he was preparing to confront. Third, there was evidence that appellant carried with him the murder weapon—a .38 caliber revolver—sometime after he had exchanged cars with Jackson, again showing to the jury his preparation for a violent confrontation. Finally, the jury could have concluded that appellant was the aggressor and fired with premeditation and deliberation at the other car, striking and killing the decedent. All this evidence forms a sufficient basis for a conclusion by a jury that appellant did act with the requisite premeditation and deliberation when he shot at the other car resulting in this homicide.

## II

## DENIAL OF CONTINUANCE

Appellant contends an abuse of discretion on the trial court's part requiring reversal because it refused to recess the trial after defense counsel had announced ready and presented three witnesses but then acknowledged his other witnesses were not present and therefore he could not proceed.

The record reflects that after the government rested its case and the court denied a defense motion for judgment of acquittal, the following colloquy occurred:

THE COURT: You are ready to proceed right now?

COUNSEL: Yes, your Honor.

The attorney made an opening statement and then called appellant to the stand (Record at 283–84). He was followed as witnesses by a Mr. Hatcher (Record at 338) and a Ms. Corley (Record at 349); their testimony corroborated his account of how he had obtained the pistol with which the decedent had been fatally wounded later. At that point the following colloquy occurred (Record at 355–56):

COUNSEL: Your Honor, my next witness would be Mr. McKinney, but we don't have Mr. Robinson [an attorney].

THE COURT: Can we call your other witnesses?

COUNSEL: That's the only five I had.

THE COURT: That would be your last witness?

COUNSEL: I have three other witnesses, but they are not here.

THE COURT: Well, sir, I am finishing this case, today.

COUNSEL: Well, I would ask your Honor, to at least give me an hour or so.

THE COURT: No, sir. No, sir. No, sir.

COUNSEL: Your Honor, would you allow me to be heard on the issue? I didn't anticipate that, you know, when I counted the witnesses last night, I counted 10 to 12 Government witnesses, which to me seemed like it would be either the most of or a full trial day to cover himself. In the event the testimony might move more quickly than I anticipated, I brought down three witnesses, had three witnesses on alert to testify today.

During the lunch hour, I tried to contact the other witnesses. I just didn't have enough time to contact them.

THE COURT: . . . [T]he only thing I can say to you is that, surely that is

your responsibility. You announced ready in here, two days ago. You announced ready in here yesterday. And, I told you gentlemen that I had to leave the bench on that day, yesterday, by four o'clock. But, you saw how many witnesses we got through, after opening statements and everything after lunch, so surely that is your responsibility.

I shall do my best to get Mr. Robinson down here, or some other attorney who can talk to Mr. McKinney, but we are finishing all the evidence in this case today, because my calendar will not permit such rushing. I will give the jury a short recess.

The court, out of the presence of the jury, subsequently asked the potential defense witness, Mr. McKinney, to stand by with an attorney whom it had called out of the lawyer's lounge to advise the witness of his constitutional rights (Record at 357–58). This attorney detailed to the court the advice he had given the potential witness and that "he [Mr. McKinney] would like Mr. Robinson [his attorney] to be present." (Record at 359.) The court replied (Record at 359–60):

THE COURT: Well, Mr. Robinson is not present and the defendant has just advised me as I said, at two-thirty, less than two hours ago, that he wishes to call Mr. McKinney as a witness. I have done all that I can possibly do, to get Mr. Robinson here. I cannot wait until I can find Mr. Robinson. I do not know what Mr. Robinson's obligations are today. I do not even know if he is in the city, and I cannot wait until Monday to see if Mr. Robinson would be available to help Mr. McKinney.

Defense counsel then apprised the court of his estimate of "approximately one hour more of testimony, at the maximum." (Record at 361–62.) The following colloquy then occurred (Record at 362–63):

THE COURT: We have already discussed that and I have told you that I don't have time to wait for your witnesses. You know that trial has been proceeding for some days now. You announced ready; you did not ask me to put witnesses on call. I would not have the luxury of waiting for your witnesses. So, we won't even discuss any witnesses who are not here, because I am going to finish all of the evidence in this case, today. So, from that point, I will be happy to hear you.

COUNSEL: All I would ask, if your Honor would allow me to speak on that issue, at the end of the colloquy. I would like to put on Mr. McKinney or in his absence, Mr. Little.

I have called Mr. Little and he is in the Halfway House here in the District. I called the Halfway House this morning. He had left for work. When I called at lunchtime, they were going to try and call him and send him down. He knows where to go. I can't reach him. That's all.

THE COURT: Well, . . . you have waited until the eleventh hour to seek the assistance of the Court. If you knew that Mr. Little was in the Halfway House, if you knew that he had gone to work, and more than likely, anyone assigned to a Halfway House has an employment record that is known to the manager, or who have you, or the Halfway House. This court could have issued a bench warrant or a forthwith summons for Mr. Little, early today.

If you knew that you were going to call Mr. McKinney as a witness in this case, you could have told me much earlier, that you were going to call him, much earlier than two-thirty.

I am not saying that I could have found Mr. Robinson, but, at least, I would have had an opportunity, if not to get Mr. Robinson, to get his partner. Now, I am not able to get either one of them. I haven't been able to reach either one of them on the phone.

The defense attorney then decided not to call as a witness Mr. McKinney in the absence of his own attorney, Mr. Robinson (Record at 364), and conceded he was unable to proceed since he had "no other witnesses here at the Courthouse" (Record at

365). In response to the court's question, the attorney advised that his next witness would be Mr. Little (Record at 366), who was the other person appellant had picked up *after* the shooting but before his arrest near the house of his cousin, Donna O'Connor.

Again, in response to a question from the court, defense counsel identified his next witness as the bar owner whose gun, stolen from him, was the murder weapon and who had already testified as a prosecution witness. Defense counsel then under continued questioning by the court identified his remaining witnesses—who were not present—as "Paul James, a police officer . . . released by Mr. Chapin [the prosecutor]" and "Joseph Chane . . . in custody in Lorton, Virginia," who "has been here for the first two days of trial, but he is not here now." (Record at 366.) The court noted that all defense witnesses, except Mr. McKinney who was a defendant in another case (Record at 357), had been subpoenaed. (Record at 367.)

■■■ The matter of granting a continuance is entirely within the discretion of the trial judge, but a rigid insistence by the court upon expedition of trial in the face of a justifiable request for delay can render the right to defend an empty formality. *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 929 (1964). To reconcile these competing concerns, this court has said a party seeking a continuance must make a showing that such continuance is "reasonably necessary for a just determination of the cause." *Brown v. United States,* D.C.App., 244 A.2d 487, 490 (1968). Although there are no ironclad rules for determining when the denial of a continuance is so arbitrary as to deny due process, *Ungar v. Sarafite, supra,* 376 U.S. at 589, 84 S.Ct. 849, a party seeking a continuance to obtain witnesses must at a minimum show (1) who they are, (2) what their testimony would be, (3) the relevance and competence of such testimony, (4) that the witnesses can probably be obtained if the continuance is granted, *Holt v. United States,* D.C.App., 381 A.2d 1388, 1391 (1978); *Neufield v. United States,* 73 U.S.App.D.C. 174, 179, 118 F.2d 375, 380 (1941), *cert. denied,* 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942); and (5) that due diligence has been used to obtain their attendance at trial. *Neufield, supra.* Appellant failed to meet his burden to satisfy this minimum requirement; while he ultimately, under questioning by the court, revealed the identity of his witnesses who were not present, he gave no indication of what these witnesses' testimony would be, nor the relevance of their testimony. Furthermore, a review of the trial proceedings reveals a clear failure on the part of appellant to exercise due diligence to insure the witnesses' presence at the trial. That is, before asking for a continuance, defense counsel had given no forewarning to the court of the problem in presenting his witnesses and did not ask the court to issue bench warrants. We therefore hold that the denial of the continuance did not constitute an abuse of discretion by the trial judge under the particular circumstances of this case.[4]

4. We cannot agree with the dissent that defense counsel had no opportunity to make the kind of proffer dictated by *Neufield v. United States, supra.* From the time he realized his witnesses were unavailable until the court's final and definitive denial of his request for a continuance, defense counsel made no attempt to make a *Neufield* proffer. Even during the colloquy on which the dissent focuses, the judge did not refuse to hear an informative proffer, but only argument by counsel. Furthermore, it can hardly be said that the judge, by her action "[was in effect] penalizing appellant, *without notice,* for a failure to obtain witnesses during [an] earlier, two-hour period." First, if there was a penalty here, it was plainly self-imposed by counsel's statement to the judge at the beginning of his case that he was ready and then failing to secure their appearance when their turn to testify came. As for counsel being without notice of the court's determination to proceed to have all evidence adduced by the day's end, the record suggests that the trial court had informed counsel on Thursday of its intention to conclude the trial on Friday and had made it clear that it expected witnesses to be present when called (Record at 356). Counsel must have therefore had at least an inkling of the importance the trial judge placed on being ready to present witnesses and thus have been able to anticipate the judge's reaction to any request for continuance.

## III

### SENTENCING

The third and final assignment of error we consider concerns the enhanced sentences imposed by the trial court for the convictions of receiving stolen property and carrying a pistol without a license. With respect to the conviction for receiving stolen property, the trial court sentenced appellant to eighteen to fifty-four months based on Section 22–104a. The maximum sentence for a conviction for receiving stolen property where the property involved is valued at less than $100 is one year. Section 22–104a permits the sentencing judge to increase sentence to what he deems necessary, including life imprisonment,

> [i]f [the defendant] (A) is convicted in the District of Columbia of a felony and (B) before the commission of such felony, was convicted of at least two felonies . . .

This section only applies to a conviction for a felony and, as the government concedes, appellant was convicted of a misdemeanor when convicted for receiving stolen property. Therefore, this particular conviction must be remanded for resentencing. So, too, the sentence imposed by the court for carrying a pistol without a license cannot stand in light of our decision today in *Henson v. United States*, D.C.App., 399 A.2d 16 (Nos. 11946 & 12619, Feb. 13, 1979). There, we held that "in the same proceeding, a single prior felony conviction may not be used to convert a conviction under § 22–3204 [carrying a pistol without a license] into a felony offense and to serve as one of the two prior felony convictions for enhanced sentencing under § 22–104a." Here, the record reflects (at 27–28) that the informations filed before trial by the government cited a 1965 conviction of appellant for assault with intent to commit robbery as *both* the prior felony permitting the offense charged of carrying an unlicensed pistol to be treated as a felony under § 22–3204 and as one of two prior felonies permitting enhanced punishment pursuant to § 22–104a(a)(1)(B). This conviction must also be remanded for resentencing.

Accordingly, the judgments of conviction are affirmed but the case is remanded for resentencing on the convictions for carrying a pistol without a license and receiving stolen property.

*So ordered.*

FERREN, Associate Judge, concurring in part and dissenting in part:

I concur in Parts I and III of the court's opinion but dissent from Part II. I would hold that the trial court erred in denying the defense request for a continuance.

This is a first-degree murder case; appellant O'Connor faced life imprisonment. At trial, the defense presented the testimony of three witnesses and identified five more who were temporarily unavailable. At 4:30 p. m. on a Friday, the court over objection rested the defense case because of a failure to produce the remaining witnesses. The record demonstrates that the court did so without giving defense counsel an adequate opportunity to be heard. Moreover, the court denied the continuance knowing that (1) the court or prison system was responsible for the failure to produce one subpoenaed defense witness imprisoned at Lorton, (2) the trial, in any event, had to be carried over to Monday morning for closing arguments, instructions, and jury deliberation, and (3) according to defense counsel's proffer, the testimony of all five witnesses would require no more than an hour. I agree that appellant should have been more diligent in bringing defense witnesses to court, but when all the facts are weighed, I believe that the trial court's ruling violated appellant's rights.

I would therefore remand the case to the trial court, in order for appellant to proffer what the testimony of the absent defense witnesses would have been, and for the trial court to issue findings and conclusions, reviewable by this court, as to whether that testimony might have affected the outcome, warranting a new trial.

## I

At approximately 2:30 p.m. on Friday, May 14, 1976, the third day of trial, the

defense came to an unexpected halt after three of its witnesses had testified. There were to be five other defense witnesses, but only one was in the courtroom, James McKinney, an original codefendant whose case had been severed. McKinney would not immediately take the stand, however, because his attorney was not present—a precaution necessary because of anticipated Fifth Amendment problems. Defense counsel had subpoenaed three of his other four witnesses.[1] Unfortunately, one of these witnesses, who was on a "comeup" order from Lorton—and had been present the first two days of trial—had not been brought to court the third day (for reasons not apparent of record). The other two did not appear because defense counsel, anticipating a more slowly paced trial, apparently had informed them that they would not be needed on Friday. He had tried but failed to reach them during the luncheon recess.

Defense counsel asked the court for "an hour or so" to try to contact McKinney's attorney and the other defense witnesses. The court at first said "no," then agreed to a "short recess" after reminding defense counsel that he had "announced ready" and thereby had assumed responsibility for having his witnesses present. The court offered to do its best to help find McKinney's counsel, but added that "we are finishing all the evidence in this case today."

Court reconvened at approximately 4:30 p.m. Because the trial judge had been unable to reach McKinney's attorney, she had arranged for another lawyer to counsel McKinney during the recess. The lawyer informed the court, when trial resumed, that although McKinney wanted to testify, he wished his own lawyer there to advise him. Defense counsel agreed that McKinney could not properly be ordered to testify, absent his own lawyer.

At that point, defense counsel informed the court that his five witnesses would require, altogether, approximately one more hour of testimony. The court replied, "Well, they are not here. You announced ready and we are ready for them and we shall proceed." The court then asked, "Who is your next witness?" Defense counsel identified "Aaron Little" (who had been in the car with appellant and McKinney at the time of arrest) "Mr. Harrington, the owner of the bar" (where a skirmish had occurred between appellant and another just before the shooting). "Paul James, a police officer," and "Joseph Chane, he is not here. He was not brought up from yesterday. He is in custody in Lorton, Virginia." Neither Chane nor James had been identified in earlier trial testimony.

The court thereupon said, "Very well sir. I guess you have to rest, and I guess you must rest, you have called all of your witnesses. They have not appeared." Immediately thereafter the following colloquy took place:

Mr. Farquhar: Well, your Honor, I think the Court could continue the matter until Monday.

The Court: Mr. Farquhar, you have told me that, several times, and I have told you that the Court cannot continue the case until Monday.

Mr. Farquhar: Well, certainly, we can start earlier.

The Court: As I said, I have already ruled, we cannot continue it.

Mr. Farquhar: May I have objection to the rule and state the reasons why?

The Court: You may not. I have given you all the time you need to state why you want it. I am certainly not going to let you make comments on my ruling.

Mr. Farquhar: Well, your Honor, I think I am entitled to state—

The Court: You may not comment on my ruling. I don't know any attorney who has the right to comment on a ruling. I have given you an opportunity to be heard. You have made that argument approximately three times and every time I have told you I am not going to wait for you witnesses.

---

1. The fourth was Officer Paul James, who had been present for the government and then dismissed.

Mr. Farquhar: Your Honor, earlier, I was not arguing to the Court. The law, I think there is law in this area—I was making requests of the Court.

The Court: Mr. Farquhar, if there was law in the area, you could have argued the law. I am not going to have you comment on my ruling. I ruled on what you presented to me. All right. That's what I ruled on, what you presented to me. You are not the Court of Appeals.

Mr. Farquhar: I understand that.

The Court: All right. So you are not going to comment on my ruling. I have ruled on what you presented to me.

Mr. Farquhar: May I argue the law?

The Court: No, you may not, sir. You may not, because I have already ruled on what you argued to me.

\* \* \* \* \* \*

The Court: You may not comment on anything further as it relates to the witnesses.

## II

Appellant argues that the trial court abused its discretion in resting the defense case, over objection, rather than granting a weekend continuance. His arguments are both procedural and substantive. He maintains, first, that he was denied due process because the court rested his case without giving counsel an opportunity to be heard on the request for a continuance. Second, as to the merits, appellant claims that the court abused its discretion in that the murder trial, in any event, had to be carried over to Monday for closing arguments, jury instructions, and jury deliberation; the court was aware that the testimony of all five remaining witnesses would not require

more than approximately one hour; and at 4:30 p. m. when the court ruled on the continuance request, the court knew such a continuance would not waste time, for in lieu of further testimony on Friday the court could (and did) profitably discuss jury instructions with counsel.

I agree with appellant's two basic arguments and will take them up sequentially—first, the alleged denial of a right to be heard.

A. The trial court has broad discretion in ruling on a defendant's motion for continuance. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 929 (1964). On the other hand, the denial of a continuance may reach an unconstitutional dimension. *See id.; Shirley v. North Carolina*, 528 F.2d 819, 822 (4th Cir. 1975) (conviction reversed for denial of a continuance to obtain testimony of a critical defense witness).[2] In any event, for proper exercise of discretion in ruling on a request for continuance to obtain defense witnesses, the court must be willing to listen to counsel's reasons for the request. *See Johnson v. United States*, D.C.App., 398 A.2d 354 at 365 (1979).[3] As the Supreme Court has stated:

> There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, *particularly in the reasons presented to the trial judge at the time the request is denied.* [*Ungar v. Sarafite, supra*, 376 U.S. at 589, 84 S.Ct. at 850 (emphasis added).]

The significance of the trial court's taking time to listen carefully to counsel's reasons is highlighted not only by the constitutional gloss on the issue, *see Ungar, supra* ; note 2

2. A defendant's interest in presenting the testimony of witnesses "implicates constitutional values, since the Sixth Amendment right to compulsory process is 'in plain terms the right to present a defense.'" *United States v. Haldeman*, 181 U.S.App.D.C. 254, 306, 559 F.2d 31, 83 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (footnote omitted); *see Chambers v. Mississippi*, 410 U.S. 284, 302, 92 S.Ct. 754, 30 L.Ed.2d 773 (1973) (few rights are more fundamental than that of an accused

to present witnesses in his own defense); *People v. Foy*, 32 N.Y.2d 473, 478, 346 N.Y.S.2d 245, 249, 299 N.E.2d 664, 667 (1973) (same).

3. *See generally Shankle v. Shankle*, 289 N.C. 473, 223 S.E.2d 380, 386 (1976) (before ruling on a motion for c continuance, the trial court should be required to hear the evidence pro and con, consider it judicially, and then rule with a view to promoting substantial justice).

*supra*, but also by the fact that the United States Court of Appeals for the District of Columbia Circuit has specified criteria to assist the court in determining, in this context, whether a continuance "is reasonably necessary for a just determination of the cause," *Neufield v. United States*, 73 App. D.C. 174, 179, 118 F.2d 375, 380 (1941), *cert. denied*, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942):

> If the continuance is sought for the purpose of securing the attendance of witnesses, it must be shown who they are, what their testimony will be, that it will be relevant under the issues in the case and competent, that the witnesses can probably be obtained if the continuance is granted, and that due diligence has been used to obtain their attendance for the trial as set.

*See Holt v. United States*, D.C.App., 381 A.2d 1388, 1391 (1978); *United States v. Uptain*, 531 F.2d 1281, 1286–87 (5th Cir. 1976).

In the present case, the record indicates that the trial court, before ruling on the continuance, refused to permit defense counsel to explain how material the witnesses were to appellant's case. Counsel never had a realistic opportunity to make a proffer under the *Ungar-Neufield* criteria. Thus, the court ruled without making an effort to achieve an informed judgment.

More specifically, when counsel and court found themselves at 4:30 on Friday afternoon with no more defense witnesses, and defense counsel requested—for the first time—a continuance until Monday, the court responded, "I *have told you* that the Court cannot continue the case until Monday . . . . As I said, I *have already ruled*, we cannot continue it" (emphasis added). When counsel asked if he could "have objection to the rule and state the reasons why," the court replied, "You may not. *I have given you all the time you need*, to state why you want it. I am certainly not going to let you make comments on my ruling" (emphasis added). After reading the transcript, I have concluded that the trial judge's 4:30 announcement

that she (1) had "already ruled" on the defense request, having (2) given counsel "all the time" he needed to state why he wanted a continuance, was inaccurate.

Although the judge did say, as early as 2:30 p. m., that "we are finishing all the evidence in this case today," that statement was not in response to a request for a weekend continuance; nor was it announced as a legal ruling. The statement was expressed, as I read it—or, more importantly, as defense counsel reasonably would have understood it—as a strongly-felt aspiration. Moreover, by giving defense counsel, at that point, a two-hour recess to look for McKinney's lawyer with the court's active assistance, the trial court implied agreement with appellant's legal position that his right to present witnesses was paramount, despite the court's reluctance to permit a recess. The court did not implicitly put the defense on notice that the gavel would fall, closing its case, if counsel did not produce McKinney's lawyer or another witness when court reconvened. Thus, when trial resumed at 4:30, the court had not "already ruled." In fact, the court could not have done so, for according to the record defense counsel did not make his first request for a weekend continuance until after court had reconvened at approximately 4:30.

Nor did the trial judge, before she ruled (soon after 4:30), give defense counsel a realistic opportunity to make a proffer as to the materiality of the five missing witnesses under the *Ungar-Neufield* criteria. At 2:30, when the court had said that "we are finishing all the evidence in the case today," the focus was on finding McKinney's lawyer during a short recess, not on what other witnesses would say or on a request for a weekend continuance. Later at 4:30, when the judge asked counsel for the names of the missing defense witnesses, there was no indication that counsel, in briefly responding to the question as literally asked, was foregoing his only opportunity to make an *Ungar-Neufield* proffer. Counsel, of course, knew that the court did not want to delay the case—in fact, that the court very

much wanted to complete all testimony on Friday. But as I read the record, counsel had no reason to anticipate that the court would rest the defense case without permitting him to speak about the significance of his absent witnesses.

I conclude that the trial court precipitously—and thus improperly—turned what had been a joint effort with counsel to find McKinney's lawyer into a summary denial of the request for continuance, without affording counsel an opportunity to be heard.

B. Now to the merits. One can argue that because defense counsel apparently told some of his subpoenaed witnesses they need not appear on Friday, any proffer would have been irrelevant, given the admitted failure to meet the last *Neufield* criterion for a continuance; *i. e.*, "that due diligence has been used to obtain their attendance for the trial as set." *Id.* 73 App. D.C. at 179, 118 F.2d at 380. This argument has force but is not conclusive, for appellant was not alone responsible for the failure of all witnesses to appear. By failing to effect a comeup order for witness Chane, the court and prison systems must share responsibility for any lack of diligence. Because Chane had been present for two days of trial pursuant to such an order (issued in response to appellant's subpoena), the defense had no reason to expect Chane's absence the third day—and cannot be faulted for it.

But even more to the point, the question of appellant's diligence is not determinative. Even an admitted failure to satisfy the fifth *Neufield* criterion does not preclude the trial and appellate courts from considering other facts, for the *Neufield* criteria—while providing a helpful guide— are not the only criteria. Nor do they reflect the "minimum" showing required (as the majority has argued).[4] Over 20 years after the circuit court's decision in *Neufield*,

*supra*, the Supreme Court stressed in *Ungar, supra* that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process," *id.* 376 U.S. at 589, 84 S.Ct. at 850; the trial court must consider all the circumstances before ruling. In my judgment, despite appellant's obvious responsibility for failing to have witnesses present, the trial court should have perceived other relevant facts and weighed them together with appellant's questionable diligence before ruling on the requested continuance. *See Johnson v. United States, supra*, at 365.

The following considerations stand out: First, even without a formal *Ungar-Neufield* proffer, the court had to be aware from the government's case that some of the defense witnesses appeared to be material. At least two of them, McKinney and Little, had been with appellant when he was arrested shortly after the incident, and Harrington had been at the scene of an arguably material, preliminary event (the skirmish at the bar). Second, it was clear to everyone, once court reconvened at 4:30, that the case would have to be continued to Monday morning for closing argument, instructions to the jury, and submission of the case. Third, counsel had advised the court that the witnesses' testimony would take no more than one hour. Fourth, appellant was on trial for first-degree murder. When these facts are added to the court and prison systems' responsibility for the failure of one defense witness (Chane) to appear, I find error. The additional amount of time required to complete the defense case on Monday morning would impose a minimal burden on the court system and the prosecution (which had completed its case-in-chief and did not object), compared to the burden on a defendant, facing life imprisonment, who is denied the opportunity to present his complete case. *See United*

---

4. Contrary to the majority's statement that the *Neufield* criteria set the minimum standard, the United States Court of Appeals for the District of Columbia Circuit recently has stated that "sometimes a continuance will be required even absent a specific proffer as to the nature of the missing evidence. . . . Thus we

restate the [*Neufield*] requirements here as factors bearing on the ultimate question *Neufield* poses: is a continuance 'reasonably necessary for a just determination of the cause.'" *United States v. Haldeman, supra* 181 U.S.App.D.C. at 307 n.126, 559 F.2d at 84 n.126 (citation omitted).

*States v. Haldeman, supra* 181 U.S.App.D.C. at 306, 559 F.2d at 83.[5]

There is an air of unreality about what happened here. As already indicated, the only relevant time period came after 4:30. The trial judge, by granting a recess from 2:30 to 4:30, in effect had acknowledged the validity of the defense request for a recess during that earlier period. It is not unknown for trial courts to adjourn at or soon after 4:30; in fact, the trial judge here noted that she had intended to adjourn at 4:00 p. m. on a previous day of trial. Thus, by resting the defense case at 4:30, over objection, while continuing the case until Monday morning for closing argument and jury instructions, the trial judge in effect was penalizing appellant, *without notice*, for a failure to obtain witnesses during that earlier, two-hour period, not because of a loss of court time after 4:30. I do not believe the court can impose such a penalty consistent with due process.

C. Because we do not know what the defense proffer under *Ungar, supra* and *Neufield, supra* would have been, we cannot tell whether the trial court's ruling was—or was not—harmless error. *See Johnson, supra*, slip op. at 20–22. Thus, we cannot properly reverse the conviction and remand for a new trial. The most appropriate relief would be to remand for a defense proffer and trial court findings and conclusions based on *Ungar* and *Neufield*. The trial court should then reach a conclusion as to whether the testimony, as proffered, might have affected the outcome, thereby warranting a new trial—the kind of test utilized in evaluating the impact of requested but suppressed *Brady* or Jencks Act material. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (*Brady*); *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (Jencks); *Brady v. Maryland*, 373 U.S. 83,

83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*Brady*). Were the court to deny a new trial, this court, upon a proper appeal, would then be in a position to consider the merits of appellant's request for reversal.

In summary, I believe that the trial court erred in failing to grant appellant's request for a continuance—indeed, even to conduct a proper hearing on it. I therefore respectfully dissent.

---

**5.** As it turned out, no burden at all would have been imposed, for in lieu of further testimony, court and counsel discussed jury instructions after 4:30 on Friday instead of on Monday, thereby freeing time that could have been used for defense testimony on Monday morning. Although this discussion occurred after the trial court had ruled on the request for continuance, and is therefore arguably irrelevant to review of the court's exercise of discretion, this evidence suggests the strong possibility that the trial judge knew at the time of the ruling that the balance of Friday could be used profitably.