**Rudolph McCRAE & Derrick R. Miller, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 99–CF–849, 99–CF–1534.**

District of Columbia Court of Appeals.

Argued Nov. 18, 2008.
Decided Sept. 10, 2009.

---

Mara Silver, Public Defender Service, with whom James Klein and Sandra K. Levick, Public Defender Service, were on the brief, for appellant Miller.

Lisa D. Chanel, appointed by the court, for appellant McCrae.

John P. Gidez, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Cynthia G. Wright, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and KRAMER, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Derrick Miller and Rudolph McCrae appeal from their convictions for assault with intent to kill while armed and related offenses arising out of a neighborhood feud between two groups of young men. Miller's sole argument is that the trial court erred in its refusal to give an instruction on duress. McCrae challenges the trial court's refusal to sever, raises objections to remarks made by counsel in opening and closing arguments, and questions the sufficiency of the evidence on two counts. We affirm.

## I. The Facts

Appellants Miller and McCrae were members of a group sometimes called the 1–7 Crew (so-named because they spent their time near the intersection of 17th and Euclid Streets, in Northwest Washington, D.C.) that also included Omar Garris, Juan Salazar, Kenneth Johnson, Christopher Nicholson, Manuel Orozco, and James Marshman.[1] The 1–7 Crew were rivals with the nearby Holmead Crew (from the 3500 block of Holmead Place, Northwest). On the night of September 20, 1996, a fight between members of the 1–7 Crew and the Holmead Crew broke out at a nightclub. The fight moved outside and unidentified members of the Holmead Crew stabbed Salazar and Nicholson. Tensions between the groups escalated, and the 1–7 Crew decided to retaliate. In the early morning hours of September 21, 1996, several crew members rode their bicycles to Holmead Place. Shots rang out, and a member of the Holmead Crew was shot in the hand as the group on the porch ran for cover.

The next day, September 22, the crew gathered at the intersection of 17th and Euclid Streets. McCrae told Orozco what had happened the night before, commented that it was not sufficient revenge, and said he was going to bring the Holmead Crew "pain." That night, the crew gathered to further plot their revenge. Around 3:00 a.m. on September 23, 1996, members of the Holmead Crew and their friends were in front of a building on Holmead Place when "somebody got to shooting." One person was shot and killed and another was shot twice in the back. Later that night, in apparent retaliation, Johnson's car was "shot up" while Johnson and his friends were getting out of the car.

Things apparently were peaceful for several weeks.[2] Then, on October 29, the Holmead Crew rode by on bicycles and shot at the 1–7 Crew as they hung out on the Cooke Elementary School playground. No one was injured, but the shootings fueled the 1–7 Crew's desire for revenge.

On the afternoon of October 30, 1996, the 1–7 Crew decided to retaliate and the critical events relevant to the instant appeal unfolded. Several members of the group, including Miller and McCrae, went to a Silver Spring gun store to purchase ammunition. The men returned to the area around Fuller and 17th Streets to plan further. Garris testified that McCrae threatened to "punish" anyone who did not go up to Holmead that night, causing Garris to go along out of fear. McCrae told the men to get "strapped up," that is, to go get their black hooded sweatshirts and their guns. They proceeded to Orozco's home on Columbia Road. At one point, McCrae and one other crew member, not Miller, went some six blocks away to fetch guns. McCrae, Miller, Garris, Nicholson, Marshman, and Johnson each loaded a gun. The six men, all in black hooded sweatshirts, then began the fifteen or twenty minute walk to Holmead Place in two groups of three to avoid attracting attention. Garris walked with McCrae and Miller.

According to Garris, as the 1–7 Crew approached the Holmead area, they began to run, chasing "some Holmead people," because if "any of the [Holmead Crew] guys [were] out there, [the 1–7 Crew] was going to go get them." As the shooting began, Garris heard McCrae yell "he's in the basement" and then saw Miller shooting into the basement area. Garris said

---

1. Much of the testimony at trial came from four of these crew members, Garris, Nicholson, Orozco, and Marshman, as part of their respective cooperation agreements with the government.

2. The evidence of the September events suggested that McCrae could be a violent and dangerous individual.

McCrae, Nicholson, and Marshman were also shooting and that he himself shot at a man who pulled up in a car and began shooting at the 1–7 Crew. The man in the car turned out to be undercover Metropolitan Police Officer Miguel Montanez, who had seen the group of men and, suspicious, had followed them. Officer Montanez shot Nicholson in the leg and apprehended him, but the other men fled and met back at 17th Street. Miller, who had been shot, was taken to a hospital in Maryland.

A jury convicted both McCrae and Miller of conspiracy, D.C.Code § 22–105(a) (1981), four counts of assault with intent to kill while armed (AWIKWA), D.C.Code §§ 22–501, –3202, four counts of possession of a firearm during a crime of violence (PFCV), D.C.Code § 22–3204(b) (1995 Supp.), one count of carrying a pistol without a license (CPWL), D.C.Code § 22–3204(a), and one count of unlawful possession of a pistol (UPP), D.C.Code § 22–3203(a)(2) (1981). Miller was also convicted on one count of obstruction of justice. D.C.Code § 22–722. Both filed timely notices of appeal.

## II: The Requested Duress Instruction

■ Miller raises a single argument on appeal, specifically, that the trial court erred by refusing to instruct the jury on the defense of duress.[3] Miller's request was based essentially on a single piece of testimony by Garris in cross-examination. Garris testified about McCrae's threat that "whatever one of you all not going, [I'm] going to punish." Garris understood "punish" to mean "kill." Garris said he indeed believed McCrae would kill him if he did not go and that he went along on the venture only out of fear of McCrae. Miller's argument essentially is that if Garris feared for his life and acted under duress, the jury could reasonably infer that Miller did so for the same reason.

■ "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Adams v. United States*, 558 A.2d 348, 349 (D.C.1989) (citations omitted). Thus, the proper inquiry is whether there is evidence from either the prosecution or defense that fairly raises the defense. *McClam v. United States*, 775 A.2d 1100, 1104 (D.C.2001) (citations omitted).[4] However, where there is no factual or legal basis for a requested instruction, it is not error for the trial court to refuse to instruct the jury on that defense. *Bonilla v. United States*, 894 A.2d 412, 417 (D.C.2006). "A duress instruction is appropriate if the evidence is

3. Miller's counsel did, however, argue that Miller had "no choice" but to go up to Holmead Place for fear of McCrae and the threat, but that Miller did not do anything once he was there. We address McCrae's claim of error regarding that feature at pp. 11–12, *infra*.

4. Another way in which we have articulated the case is that "[a] defendant 'is entitled to a jury instruction on any issue fairly raised by the evidence, ... 'however weak' that evidence may be,' as long as a reasonable juror could credit the evidence." *Frost v. United States*, 618 A.2d 653, 662 n. 18 (D.C.1992) (citing *Carter v. United States*, 531 A.2d 956, 959 (D.C.1987); *Goddard v. United States*, 557 A.2d 1315, 1316 (D.C.1989)). It is not correct

that any evidence, however weak, entitles the defendant to an instruction; rather, there must exist evidence sufficient to find in the defendant's favor. *Hernandez v. United States*, 853 A.2d 202, 205 (D.C.2004); *see United States v. Bailey*, 444 U.S. 394, 415, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) ("[I]t is essential that the testimony given or proffered meet a minimum standard as to each element of the defense, so that, if a jury finds it to be true, it would support an affirmative defense"). In other words, the evidence, however weak, must be sufficient to create a prima facie defense of duress. The government then bears the burden to prove beyond a reasonable doubt that the defendant did not act under duress.

sufficient for a reasonable jury to find that the defendant participated in the offense as the result of a reasonable belief that he would suffer immediate serious bodily injury or death if he did not participate in the crime." *McClam, supra,* 775 A.2d at 1104. The defendant must also have no reasonable alternative to committing the crime. *Id. (citing Bailey, supra* note 4, 444 U.S. at 410, 100 S.Ct. 624). These limitations on a claim of duress are all contained in the relevant portion of the Criminal Jury Instruction for the District of Columbia, No. 5.04 (Duress) (4th ed. rev.2008) reading as follows:

> Not every form of duress or coercion, however, relieves a defendant of responsibility for a criminal act. Coercion which will excuse the commission of a criminal act requires that the defendant [committed] [participated in] this offense as the result of a reasonable belief:
>
> 1. That s/he would suffer *immediate* serious bodily injury or death if s/he did not [commit] [participate in] the crime; and
>
> 2. That s/he had *no reasonable opportunity to escape the danger* without [commiting] [participating in] the crime. [Emphasis added.]

The government argues that, apart from these requirements, not a shred of evidence indicates that Miller himself, unlike Garris, held any such fear of McCrae or acted solely under fear of the threat uttered by McCrae. On the contrary, the evidence gives every indication that Miller was a willing participant in planning and executing the plan for revenge. For example, Miller went to buy bullets before any alleged threats occurred. Absent any evidence of fear on Miller's part, it appears to us extremely unlikely that the jury would have ascribed to Miller the fear that Garris expressed as a defense to actions which were intended to and easily could have resulted in the death of a number of individuals. Be that as it may, we conclude that no reasonable and properly instructed jury could have found on the evidence presented here that the threat was one of *immediate* harm or that he had *no reasonable alternative* to committing the crimes.[5]

According to Garris, the only 1–7 member to testify about the purported threat,[6] McCrae threatened the group on Fuller Street. There were some comings and goings during the several hours [7] in which the crew prepared themselves in various ways and at various points for the planned event, including times when McCrae and Miller were apart, before the crew, includ-

---

**5.** Because we decide that the evidence in this case could not satisfy each of the elements of duress, Miller's reliance on *Hernandez, supra* note 4, 853 A.2d at 202, is misplaced. *Hernandez* discussed whether the evidence in that case satisfied each of the elements of self-defense and concluded that it did. *See id.* at 205. In this case, however, the evidence, viewed in the light most favorable to Miller is not merely 'weak,' but could not, as a matter of law, suffice to satisfy each of the elements of duress. *See Barnhardt v. United States,* 954 A.2d 973, 976 (D.C.2008) ("A requested instruction is not appropriate if, as a matter of law, the defendant would not be entitled to the defense."); *McClam, supra,* 775 A.2d at 1104 ("A duress instruction is appropriate if

the evidence is sufficient for a reasonable jury to find that the defendant participated in the offense as the result of a reasonable belief that he would suffer immediate serious bodily injury or death if he did not participate in the crime.").

**6.** None of the other crew members who testified described anything about a threat by McCrae or felt forced to participate in the venture.

**7.** The evidence indicates that the trip to Silver Spring and back to Fuller Street occurred around 6:00 p.m., and that the departure from Orozco's house to Holmead Place around 8:00 p.m.

ing Miller, set off from Orozco's house for Holmead Place and began shooting to kill. Certainly at the time the threat was made, Miller could not have expected any immediate bodily injury for failing to commit the crimes that were still in the future. Indeed, the moment of any immediacy did not arise, if at all, until actual arrival at Holmead Place. For a considerable period of time, including times when he and McCrae were apart, Miller had what appears to be sufficient opportunity to attempt to avoid the threatened harm without an iota of evidence that he made or contemplated any such attempt, whether by leaving on a pretext, fleeing, seeking the protection of the police or otherwise.[8] Other possible courses of action prior to and even during the walk to Holmead Place can come to mind.[9] We agree with the United States Court of Appeals for the District of Columbia that a "defendant cannot claim duress when he had, but passed up, an opportunity to seek the aid of law enforcement officials." *United States v. Gaviria*, 325 U.S.App. D.C. 322, 355, 116 F.3d 1498, 1531 (1997) (defendant not entitled to duress instruction for his participation in a drug conspiracy because he had "ample opportunities to inform" relatives, lawyers, or officials about the alleged threats). That Miller may have preferred not to involve the police is of no moment. Miller has never claimed the police would not help him. Thus, Miller's situation is distinguished from the situation in *United States v. Contento–Pachon*, 723 F.2d 691 (9th Cir.1984), on which he relies.

In *Contento–Pachon*, a Colombian man who claimed he was forced to act as a drug mule for cocaine coming in to the United States did not report his plight to the authorities because he believed the Bogota police force was corrupt. Under these circumstances, Contento–Pachon was able to argue duress to the jury. *Id.* at 694–95. Here, unlike in *Contento–Pachon*, Miller has made no argument that he could not have sought the assistance of the police to avoid participating in the crimes.

Here, Miller was claiming that, to save himself from serious bodily injury or death, he was entitled, without any criminal liability, to take the life of another or, more precisely in the circumstances here, to attempt to do so. There may indeed be circumstances where one can kill another to protect himself. Self-defense is perhaps the most common situation, but there, at least, the person whose life is taken is one who has himself threatened the killer's own life. Here, Miller is claiming the right to kill one or more individuals who were no immediate threat to him. For such a claim to succeed, surely the facts must suggest in the first instance that every reasonable alternative to such a course of action was closed. The evidence here could not sustain such a burden.

In addition to the absence of evidence of actual fear on Miller's behalf, evidence was utterly lacking that Miller acted under a reasonable fear of immediate death or serious bodily injury or, most importantly, that he had no reasonable alternative but to participate in the shootings. The trial court did not err by refusing to instruct the jury on duress.

### III. McCrae's Allegations of Error

McCrae raises a number of issues on appeal, which we may deal with more summarily.

---

8. In fact, two members of the crew, Salazar and Orozco, declined to accompany the other six men on the mission. Miller argues that these men occupied special positions in the crew which would explain why McCrae took no exception to their decisions.

9. Miller, after all, at that time was not being held at gun-point, but on the contrary was himself armed with a weapon of his own.

■ First, he contends that the trial court erred in denying his severance motions. A trial court may deny a severance motion if there is "enough independent evidence of a defendant's guilt-beyond that required for the government to survive a motion for judgment of acquittal-so that the judge reasonably could find, with substantial certainty, that the conflict in defenses alone would not sway the jury to find the defendant guilty." *Walker v. United States*, 630 A.2d 658, 663 (D.C. 1993). A codefendant's duress defense, by itself, is not a basis for severance, even though a codefendant's presentation of evidence may inculpate the defendant. *Lemon v. United States*, 564 A.2d 1368, 1372 (D.C.1989). Here, as we discuss *infra*, there was ample independent evidence of McCrae's guilt and any potential prejudice was tempered by the jury instruction that the government must prove the guilt of each defendant beyond a reasonable doubt. *See Metts v. United States*, 877 A.2d 113, 118 (D.C.2005).

McCrae also challenges the trial court's failure to intervene to prevent Miller's counsel from arguing that Miller went to Holmead Place only because of McCrae's threat and that this "not only amounted to a confession but it also [was] an implication of [McCrae's] guilt as well" that violated McCrae's constitutional rights.[10] He also challenges the trial court's failure to deal with allegedly improper remarks by the prosecution, specifically that the prosecutor paraphrased the testimony of a witness and made general comments about how crew members act. To the extent that McCrae objected at the time, he took no exception to the trial court's corrective actions. On plain error review, we are fully satisfied that no error in these regards existed here that was "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Jones v. United States*, 779 A.2d 357, 360 (D.C.2001) (citations omitted).

■ Finally, McCrae argues there is insufficient evidence to support his convictions for conspiracy and AWIKWA. In assessing the sufficiency of the evidence, we view "the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences[.]" *Newman v. United States*, 705 A.2d 246, 264 (D.C. 1997). To sustain a conviction for conspiracy, the government must prove (1) an agreement between two or more people to commit a crime, (2) knowing and voluntary participation in the agreement with the intent to commit a criminal objective, and (3) the "commission in furtherance of the conspiracy of at least one overt act by a co-conspirator during the conspiracy." *McCullough v. United States*, 827 A.2d 48, 58 (D.C.2003). McCrae acknowledges that the government's cooperating witnesses, all members of the 1–7 Crew, testified against him and detailed his involvement. While one of these co-participants did testify, at one point, that there was "no plan," his description of the desire of the crew, including McCrae, to retaliate, as well as his testimony about how the group came together on Fuller Street and decided to wear black and arm themselves before going to Holmead Place, itself provided sufficient evidence to support the conspiracy conviction. Moreover, other witnesses testified that McCrae had made the decision to go to Holmead Place that night and led the crew there. Accordingly, the jurors had before them evidence from which they

---

10. McCrae fails to identify any testimony or evidence of "confessions" by Miller that incriminated McCrae. The only portions of the record McCrae cites to are excerpts from Miller's opening and closing statements, which the jury was instructed were not evidence.

could conclude McCrae was a member of the conspiracy, and we defer to their credibility determination. *See Bouknight v. United States,* 867 A.2d 245, 251 (D.C. 2005).

■ McCrae also contends, in two sentences, that there was insufficient evidence to convict him for AWIKWA with respect to Officer Montanez, the plain-clothes officer who arrived on the scene. Even though Officer Montanez did not identify any individual shooter, the evidence showed McCrae was one of the six gunmen who went to Holmead Place with the intent to shoot anyone they saw there. Therefore, even if Garris, Nicholson, and Marshman were most likely to have shot at Officer Montanez, there is, at a minimum, sufficient evidence to support McCrae's conviction under an aiding and abetting theory of liability.[11] *See Wilson–Bey v. United States,* 903 A.2d 818, 840 (D.C.2006).

For the above reasons, the appellants' convictions appealed from must be, and hereby are,

*Affirmed.*

---

11. We note that the aiding and abetting instruction given, without objection, contained the "natural and probable consequences" language later disavowed by this court in *Wilson–Bey v. United States,* 903 A.2d 818 (D.C. 2006), but, in light of the evidence we have outlined regarding McCrae's intent and actions on the night of the shootings, it was not plain error. Under our case law, McCrae's intent to kill rival crew members would transfer to Officer Montanez. *See, e.g., O'Connor v. United States,* 399 A.2d 21, 25 (D.C.1979) (stating that the doctrine of transferred intent is part of the law in the District of Columbia).