**Juan CASTILLO–CAMPOS, Oscar Chávez, Enrique L. Morales, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 05–CF–528, 05–CF–541, 05–CF–894.

District of Columbia Court of Appeals.

Argued May 8, 2009.
Decided Jan. 21, 2010.

478 

Anne Y. Park, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Kevin F. Flynn and Angela S. George, Assistant United States Attorneys, were on the brief, foe appellee.

Mindy A. Daniels, appointed by the court, for appellant Castillo–Campos.

M. Elizabeth Kent, appointed by the court, Washington, for appellant Chávez.

Kenneth Rosenau, appointed by the court, for appellant Morales.

Before WASHINGTON, Chief Judge, and BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

After a joint trial that lasted almost two months, a jury convicted appellants Juan Castillo–Campos ("Castillo"), Oscar Chávez, and Enrique L. Morales of criminal conspiracy and of various murder, assault, kidnaping, burglary, destruction-of-property, weapons, and obstruction-of-justice charges.[1] In these consolidated appeals, each of the appellants challenges the sufficiency of the evidence as to several of the convictions. Castillo and Morales also contend that the trial judge erred in denying their motions for severance. In addition, Castillo argues that the trial court erred in permitting the government to elicit "other crimes" evidence. We agree with appellants Chávez and Morales (and with the government) that because the evidence did not show that victim Jose Diaz sustained serious bodily injury, their convictions for aggravated assault while armed (victim Diaz) must be vacated. In all other respects, we affirm the judgments of conviction.

## I. Background

The government presented evidence that appellants were members of Vatos Locos ("VL"), a gang that, over a period of years, engaged in an escalating pattern of violence against members of the rival gang known as "Mara R" or "La Raza" and its splinter group known as "STC" (Street Thug Criminals). A government witness testified that during one gathering of VL members in late 1999 or early 2000, members agreed to go on the offensive against Mara R and STC. The result was a series of assaults and murders by VL members targeted at individuals who were affiliated with the rival groups. The government argued—and the jury apparently was persuaded—that because the various crimes were in furtherance of a criminal conspiracy, guilty verdicts were warranted as to some counts even though no evidence was presented that the defendant participated personally in the commission of the charged offenses.[2]

## II. Sufficiency of the Evidence

### A. Conspiracy

Appellants contend that the evidence was not sufficient to establish that they

1. Appellant Castillo was convicted of first-degree premeditated murder (of Samuel Ávila) ("Murder I"); felony murder (of Ávila) during a burglary and kidnaping, while armed; first-degree burglary while armed; kidnaping while armed; second-degree murder ("Murder II") (of William Lazo) while armed; assault (of Carlos Hernández and Marvin Pineda) with intent to kill while armed ("AWIKWA"); possession of a firearm during a crime of violence ("PFCV"); carrying a pistol without a license ("CPWL"); conspiracy; and obstruction of justice.

 Appellant Chávez was found guilty of Murder I (of Walter Villatoro and Antonio González) while armed; Murder II (of Lazo) while armed; AWIKWA (of Angel Reyes, Romeo Quinteros, Osmín Bonilla, José Reyes–Mendoza, Roque López, Brian Barger, Hernández, and Pineda); aggravated assault (of Angel Reyes and José Díaz) while armed ("AAWA");

 assault with a dangerous weapon ("ADW") (victims Norwin Garcia, Diaz, Lopez, and Alba Cabrera); PFCV; CPWL; conspiracy; obstruction of justice; and destruction of property.

 Appellant Morales was found guilty of Murder I (of Villatoro and González) while armed; Murder II (of Lazo) while armed; AWIKWA (of García, Reyes, Quinteros, Bonilla, Reyes–Mendoza, Barger, Hernández, and Pineda); AAWA (of Díaz and Reyes); ADW (of López, Diaz and Cabrera); PFCV; CPWL; and destruction of property.

2. For example, Chávez emphasizes that he was convicted of AWIKWA as to victims Reyes and Quinteros even though the government elicited no evidence that he was present at the party on August 26, 2001 when Reyes and Quinteros were shot (by other VL members).

engaged in a criminal conspiracy. Citing the evidence that VL members largely were young men from the same neighborhood who were students at Bell Multicultural High School and whose families had immigrated from El Salvador, they contend that VL was a loose-knit group that "originated with family, school and community" and that "was incapable of forming an agreement, because it was simply too fragmented." [3] Appellants deride the government conspiracy case as based on "meetings between high school students on unknown dates." They also argue that the government failed to prove that they knowingly and intentionally joined any agreement to commit crimes. They urge that evidence of their "mere presence at the scene of the agreement or the crime, or merely being with the other participants" does not show that they knowingly joined in an agreement to commit any crime; that "unknowingly acting in a way that helps the participants or merely knowing about the agreement itself, without more" did not make them part of a conspiracy; and that the individual crimes that were charged were the only evidence that the conspiracy existed.

■■■ "The substance of the crime of conspiracy is knowing participation in an agreement to accomplish an unlawful act[.]" *Irving v. United States,* 673 A.2d 1284, 1288 (D.C.1996) (italics omitted). The specific elements of criminal conspiracy are:

> (1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspiracy, and in furtherance of its ob-

jective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment.

*Green v. United States,* 718 A.2d 1042, 1057 (D.C.1998) (quoting *Gibson v. United States,* 700 A.2d 776, 779 (D.C.1997)) (italics omitted). A conspirator may be found guilty of a substantive crime committed by a co-conspirator if the substantive crime was "a reasonably foreseeable consequence of the agreement...." *Wilson–Bey v. United States,* 903 A.2d 818, 840 (D.C. 2006) (en banc) (citation omitted).

■■■ We are satisfied that the government's evidence was sufficient to establish that a conspiracy existed and that each of the appellants knowingly participated in it. Government witness and admitted VL member Gilberto Vigil testified that, in late 1999 or 2000, at a gathering of about a dozen VL members (including appellants Chávez and Morales), members discussed Mara R and STC and agreed to "get them before they get you" [4] and to "kill or be killed." But, although the government emphasized the evidence of that agreement to go on the offensive against STC and La Raza, "participation in a criminal conspiracy need not be proved by [such] direct evidence[.]" *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Indeed, "the evidence supporting a conspiracy conviction nearly always is circumstantial because there is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations." *Wheeler v. United States,* 977 A.2d 973, 982 n. 19 (D.C.2009) (citation, alteration, and internal quotation marks omitted); *see also People v. Zamora,* 18 Cal.3d 538, 134 Cal. Rptr. 784, 557 P.2d 75, 89 (1976) (The

---

**3.** *But see United States v. Paulino,* 935 F.2d 739, 748 (6th Cir.1991) (noting that "virtually all of the members of the conspiracy were related by blood or childhood friendship").

**4.** Specifically, Vigil testified that it was "the opinion of everybody [at the meeting] saying we see one of them[,] . . . get them before they get you."

agreement or "the unlawful design of a conspiracy may be proved by circumstantial evidence without the necessity of showing that the conspirators met and actually agreed to commit the offense which was the object of the conspiracy.") (citation omitted).

■ A conspiratorial agreement may be inferred from circumstances that "include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators[.]" *Ramirez v. Almager*, 619 F.Supp.2d 881, 901 (C.D.Cal.2008) (quoting *People v. Superior Court (Quinteros)*, 13 Cal.App.4th 12, 16 Cal.Rptr.2d 462, 467 (1993)). Here, there was ample evidence of conduct by each of the appellants—their acting alongside other VL members to commit assaultive acts on STC and Mara R members[5]—from which the jury could infer that they joined in an agreement with fellow VL members to kill or otherwise "get" the rival gang members.

As appellants note, this court has acknowledged that "the sheer number and variety of criminal acts" carried out by gang members over an extended time period "might plausibly" leave a jury "uncertain whether the overt acts alleged revealed a conspiracy—*i.e.*, organized, planned, and concerted activity—rather than the uncoordinated actions ... of kids who grow up in the same neighborhood and do what they want to do[,] ... some of them ... involved in [doing] bad things," particularly if the criminal acts are directed not only against rival gang members but against others as well. *Morten v. United States*, 856 A.2d 595, 601 (D.C. 2004). Here, however, the government presented evidence of concerted attacks by VL members targeted only at STC or Mara R members. The evidence about injuries to individuals who were not affiliated with STC or Mara R showed that these individuals happened to be in the path of gunfire, not that appellants' and their cohorts' violence was targeted randomly.[6] In this case, the government's evidence allowed the jury to conclude that VL was not just a social organization, but "an integral factor in [appellants'] ... conspiracy to assault" STC members. *Perez*, 968 A.2d at 83.[7]

---

5. Several witnesses testified that groups of VL members, carrying guns or other weapons, rode in cars following or looking for STC members and initiated attacks on them. *Cf. Perez v. United States*, 968 A.2d 39, 104 (D.C. 2009) (noting that "[t]here was sufficient evidence for the jury to find that Bonilla conspired to assault and murder Helm" where there was evidence that "Bonilla (1) shared a common understanding with his coconspirators that they were going after Helm to assault or kill him; (2) undertook to deliver the assailants to Helm; and (3) one of the coconspirators committed an overt act—which may have included Bonilla's driving them," and where witnesses testified that they "saw Bonilla waiting in the car with the doors open while his friends beat and killed Helm" and one witness "saw him actually punch Helm before he reentered the car").

6. Appellants argue that the burglary, kidnaping and murder of Ávila, which the government argued were overt acts in furtherance of the conspiracy, were the result of a personal dispute between Castillo and Ávila (related to vila's relationship with Jenny Agueta, Castillo's former girlfriend and the mother of his young children), not the result of gang rivalry. The jury may have agreed, as it convicted Castillo of offenses relating to the burglary, armed kidnaping and shooting of Ávila, but acquitted Chávez and Morales of identical charges.

7. *See also Ramirez*, 619 F.Supp.2d at 901 ("common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy") (quotation marks omitted); *Perez*, 968 A.2d at 82 (noting that appellants did not challenge the trial court's ruling that "appellants' gang membership was pro-

■ Appellant Castillo emphasizes the absence of evidence that he was present at the 1999 or 2000 VL gathering at which (according to the government's theory) the conspiracy was launched, and he argues that there was no evidence that he ever joined in any such agreement.[8] However, a conspirator can join a conspiracy at any time and need not have been involved at its inception. *See United States v. Burchinal*, 657 F.2d 985, 990 (8th Cir.1981). For the jury to find that Castillo was a member of the charged criminal conspiracy, the government was not required to prove that he joined in a group deliberation from which there emerged agreement on a plan to assault STC members. Rather, the jury could find that Castillo participated in a conspiracy from the moment he knowingly joined in an effort to find and attack STC members—of which there was ample proof. *Cf. McCrae v. United States*, 980 A.2d 1082, 1089 (D.C.2009) (noting that "[w]hile one of these co-participants did testify ... that there was 'no plan,' his description of the desire of the crew, including [appellant] to retaliate, as well as his testimony about how the group came together ... and decided to wear black and arm themselves before going to [the scene of the attack], itself provided sufficient evidence to support the conspiracy conviction"); *see also Perez*, 968 A.2d at 83 (explaining that the agreement necessary for participation in a conspiracy may be "near-instant").

Finally, in challenging the sufficiency of the evidence to show a conspiracy, appellants point to what they characterize as evidence that, although the jury convicted each appellant on the conspiracy charge, the jury could not really have been persuaded beyond a reasonable doubt that appellants participated in the several-year conspiracy that the government alleged. Appellants Chávez and Morales note that they were incarcerated in 2002 and that the jury acquitted them of charged offenses that occurred after they were jailed even though—had the jury accepted the government's conspiracy theory—the jury could have found them guilty of offenses that other VL members committed in furtherance of the conspiracy even after appellants' incarceration. From this, appellants argue that the guilty verdicts on the conspiracy charge reflect juror confusion. We cannot reach that conclusion, as there are many other possible explanations for the jury's verdicts. For example, jurors, who had been instructed that a person may withdraw from a conspiracy, may have believed that, upon their incarceration, Chávez and Morales withdrew from the conspiracy. It would also have been apparent to the jury that, for whatever reason, the government did not charge each of the appellants with all of the offenses that it contended were in furtherance of the conspiracy. Jurors may have felt equally free (and they were free) to treat some offenses (such as the 2003 kidnaping and murder of Ávila, of which appellant Castillo was convicted, but Chávez and Morales were acquitted) as offenses that were independent of the conspiracy.[9]

bative of the government's charge of conspiracy" and that the prosecutor could use "gang membership ... to show identity and membership in the conspiracy").

8. Castillo also insists that he was not a member of VL. He emphasizes that his former girlfriend (Agueta) testified that she did not know him to be a member of VL, and that although there was evidence that he attended

VL parties, wore the VL color, and flashed VL gang hand signs, "anyone could attend VL parties." However, the government presented other testimony that Castillo was a member of VL, and it was the jury's province to weigh the evidence and determine the facts.

9. In any event, the verdicts were "entirely within the prerogative of the jury." *Coleman v. United States*, 295 F.2d 555, 558, 558 n. 3

## B. First–Degree Premeditated Murder

Chávez was convicted of the first-degree premeditated murder of Mara R member Walter Villatoro at a gas station on July 2, 2002. Both Chávez and Morales were convicted of the first-degree premeditated murder of Antonio Gonzalez on September 20, 2002. They contend, as to both murders, that there was insufficient evidence for the jury to find the requisite premeditation and deliberation. We disagree.

■■■ "[I]n order to prove premeditation, the government must show that the defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill." *McAdoo v. United States,* 515 A.2d 412, 427 (D.C.1986). To prove deliberation, the government must demonstrate that "the accused acted with consideration and reflection upon the preconceived design to kill." *Id.* Both "premeditation and deliberation may be inferred from the surrounding facts and circumstances[,]" *id.,* and "may occur in a period 'as brief as a few seconds.'" *Ruffin v. United States,* 642 A.2d 1288, 1291 (D.C.1994) (citation omitted).

■■ Here, the government's evidence included testimony by witnesses Salvador Chávez, Javier Morales and William Anaya that appellant Chávez bragged that he followed Villatoro and then shot him. The government also presented testimony, by medical examiner Marie–Lydie Pierre–Louis, that Villatoro was shot eight times,

including in the head and neck, at close range (*i.e.,* by a gun held six to twelve inches from his neck). The evidence that Chávez pursued Villatoro and shot him in this manner provided a sufficient basis for the jury to infer that Chávez premeditated and deliberated before committing the murder. *See Busey v. United States,* 747 A.2d 1153, 1161 (D.C.2000) ("Carrying a gun to the scene of the murder is highly probative of premeditation and deliberation because it suggests that the defendant arrived on the scene with a preconceived plan to kill.") (citations and internal quotation marks omitted); *Commonwealth v. Cruz,* 424 Mass. 207, 675 N.E.2d 764, 766 (1997) (evidence that the defendant, carrying a loaded handgun, followed the victim and then caught up with her and shot her through the head at "virtually point blank range" "fully warranted the jury's separate finding of murder in the first degree by reason of deliberate premeditation . . .").

STC member Gonzalez was shot in the head as he sat in his car on September 20, 2002. The government presented testimony that, several months before his murder, Gonzalez had accompanied an STC member who shot at appellant Morales; and that, subsequently, appellant Morales had been looking for Gonzalez. Witness Rosanna Matos testified that she saw appellant Morales shoot Gonzalez from the car in which he was seated and then get out of the car along with other men, walk toward Gonzalez's car, and shoot him again.[10] Al-

(D.C.Cir.1961) (en banc) (noting that the jury acted within its prerogative when it "acquit[ted] on the [felony] murder charge as to [one robber], who had not been present at the scene of the killing, [but] return[ed] a verdict of guilty as to the appellant[, the other robber, who shot a police officer as he tried to escape form the scene of the robbery]," even though "the jury could have returned a felony-murder verdict of guilty as to both accused since

both had participated in the same robbery," and observing that "[w]hether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty ... is immaterial. Juries may indulge in precisely such motives or vagaries.") (citations and internal quotation marks omitted).

**10.** Appellant Morales argues that the government's own evidence showed that Matos

though Matos did not testify to seeing appellant Chávez in the group, witnesses Anaya and Oscar Urquilla both testified that they heard Chávez say that he and others were chasing some gang members when they came upon Gonzalez, and that Chávez and another man shot Gonzalez.[11] Osmin Bonilla, who was with fellow STC member Gonzalez, testified that a group of shooters shot Gonzalez in the head and then got out of their car and shot Gonzalez some more before saying, "let's go. He's dead." This evidence—showing a deliberate selection of the victim, an initial shot into the victim's head from a distance, and then a resumption of the shooting at close range by multiple shooters, including Morales and Chávez—supports an inference of premeditation and deliberation as to both appellants. Contrary to appellants' argument, the inference was not undermined by the government's tactical request for a jury instruction on the lesser-included offense of second-degree murder.

## C. Second–Degree Murder

■ ■ Appellant Castillo was convicted of the October 29, 2002 second-degree murder of STC member William Lazo on the soccer field of Roosevelt High School. Government witness Urquilla testified that Castillo was with a group of VL members who went to Roosevelt looking for STC members. Witnesses Pablo Andrade, Anaya, and Bonilla were among the witnesses who gave testimony indicating that appellant Morales drove one of the cars carrying VL members to the scene and waited in his car; that appellant Chávez went onto the field and began shooting; and that when Lazo fell to the ground, Chávez went up to him, aimed, and shot him again. Government witnesses also testified that Castillo was among the VL members who went onto the Roosevelt field and that something went wrong with the gun he was holding, causing it not to fire. Thus, the government's evidence was that Castillo's gun did not work and that he could not have shot anyone at Roosevelt, including Lazo. Castillo argues therefore that the evidence was not sufficient to sustain his second-degree-murder conviction.

Castillo's argument has no merit. The evidence was sufficient to convict him of second-degree murder either as an aider or abettor or as a co-conspirator.[12] Although his "mere presence" at the Roosevelt field would not have been enough to establish guilt under an aiding-and-abetting theory, "the additional proof of conduct which designedly encourage[d] or facilitate[d] a crime [did] support an

could not have seen the shooting, as government witness Joyce Williams testified that Matos was inside her apartment with no view of the street when the shooting occurred. Williams also acknowledged, however, that she was unable to say whether Matos had come out of the apartment at the time of the shooting.

11. Chávez argues that no reasonable juror could have found him guilty beyond a reasonable doubt because these witnesses purportedly acknowledged fabricating their testimony. Chávez points, for example, to Anaya's testimony that he was "saying what they told me," testimony that Chávez argues denotes that Anaya was merely repeating what others had told him about Chávez (or what the prosecution wanted him to say). However, we read the testimony as saying that Anaya was relaying what Chávez and Morales had admitted— and the jury could have understood the testimony in the same way.

12. *See Gordon v. United States,* 783 A.2d 575, 582 (D.C.2001) ("a co-conspirator who does not directly commit a substantive offense may nonetheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement.") (citing *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

inference of guilty participation in the crime as an aider and abettor." *Porter v. United States*, 826 A.2d 398, 405 (D.C. 2003) (citation and internal quotation marks omitted). The evidence certainly permitted the jury to find that by joining with Chávez in attempting to shoot at individuals on the field, Castillo encouraged and facilitated Chávez's commission of Lazo's murder. Moreover, we are satisfied that no reasonable juror who credited the government's evidence could have failed to find that Castillo acted with the intent that is required for second-degree murder. *See Coleman v. United States*, 948 A.2d 534, 553 (D.C.2008) (noting that conviction for second-degree murder requires proof of an intent to kill or a conscious disregard of an extreme risk of death or serious bodily injury).

## D. Aggravated Assault While Armed (AAWA)

■■■■ Appellants Chávez and Morales were convicted of AAWA of Mara R member Jose Diaz in connection with the shooting of Diaz on August 16, 2001. The evidence showed that Diaz stood in place for a while after he was shot, did not undergo surgery in connection with his injury, and was able to travel to El Salvador five days after the shooting. Appellants argue, and the government agrees, that the evidence was insufficient to prove the serious bodily injury that is required for conviction of AAWA.[13] The parties agree, however, that the evidence does support convictions for ADW as to Diaz, and they request that we reverse the AAWA convictions as to Diaz and remand for entry of judgment of guilt as to ADW for both Chávez and Morales. We agree with that result. *See In re P.F.*, 954 A.2d 949, 953 (D.C.2008).

## E. Assault with Intent to Kill While Armed (AWIKWA)

■■■■ Appellants challenge several of their AWIKWA convictions, arguing that there was insufficient evidence of specific intent to kill. To prove AWIKWA, "the government had to show beyond a reasonable doubt that [appellants]: (1) made an assault on [the complainant]; and (2) did so with specific intent to kill; (3) while armed." *Nixon v. United States*, 730 A.2d 145, 148 (D.C.1999) (citation omitted). Evidence that there was animosity between the accused and the victim and that the accused targeted the weapon at a particularly vulnerable area of the body is sufficient evidence for a jury to find all of the elements of AWIKWA. *See Tolbert v. United States*, 905 A.2d 186, 189 (D.C. 2006) (involving a stabbing in the abdomen and chest).

Appellants Chávez and Morales were convicted of AWIKWA of Angel Reyes by shooting him in the stomach on August 26, 2001. Morales also was convicted of AW-

---

13. "[S]erious bodily injury" is "an essential element of AAWA[.]" *Bolanos v. United States*, 938 A.2d 672, 677 (D.C.2007). It encompasses "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." *Id.* (citation and quotation marks omitted). The cases in which we have found sufficient evidence of serious bodily injury to support convictions for aggravated assault thus have involved "grievous stab wounds, severe burnings, or broken bones, lacerations and actual or threatened loss of consciousness." *Scott v. United States*, 954 A.2d 1037, 1046 (D.C.2008) (citation and quotation marks omitted). Thus, "[t]he injuries in these cases usually were life-threatening or disabling. The victims typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties." *Id.* (citation and quotation marks omitted).

IKWA as to victim Romeo Quinteros during the same incident. As noted earlier, Chávez cites the lack of evidence that he was at the party that was the scene of these shootings. Morales emphasizes that the evidence showed that Reyes was a friend and not a member of Mara R, and that Quinteros was a friend of Reyes, facts that show that Morales would not have intended to kill Reyes. However, the government's evidence was that Quinteros antagonized some VL members at the party by flashing a Mara R hand sign and a knife; that VL member Salvador Cabezas told some VL members at the party, including appellant Morales, that Quinteros had cut Cabezas's hand; that VL member Jose Aguila told his friends that he was going to do something to Quinteros; and that when Aguila subsequently fired at Quinteros's car, he also hit Reyes, who was seated in the car. We agree with the government that the evidence supported an inference that Aguila had a specific intent to kill both Quinteros and, under a theory of transferred intent (about which the jury was instructed), Reyes. *See Ruffin,* 642 A.2d at 1298 (explaining that "a defendant can be convicted of murder or assault with intent to kill of bystander victims even where the defendant has been convicted of murder or assault with intent to kill against the intended victim," and that "where the means employed to commit the crime against a primary victim [*e.g.*, a hail of gunfire] create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.") (citation and quotation marks omitted). Having found appellants guilty of conspiracy to assault Mara R and STC gang members, the jury could reasonably conclude that the shooting of Quinteros and Reyes was a reasonably foreseeable consequence of the conspiracy. That conclusion permitted the jury to convict appellants Chávez and Morales of AWIKWA of Reyes and Quinteros on a theory of co-conspirator liability, even though the government presented no evidence that Chávez was present at the scene of the shooting and no evidence that Morales participated in the shooting.

Appellants Chávez and Morales also were convicted of AWIKWA as to STC member Osmin Bonilla and Jose Reyes–Mendoza on September 20, 2002. Bonilla—who, as noted earlier, was in the company of first-degree-murder victim Gonzalez when Gonzalez was shot—testified that he was shot at by a group of VL members (including Chávez and Morales) as he attempted to flee the scene, but was not hit. Appellants argue that there was no evidence that they intended to kill Bonilla. However, Bonilla testified not just that he was in the zone of danger of gunfire aimed at Gonzalez, but also that VL members pointed their guns at him and shot at him six times. We agree with the government that the evidence permitted the jury to infer that appellants shifted their focus and formed an intent to kill Bonilla after Gonzalez was shot dead. *Cf. McCrae,* 980 A.2d at 1090 (holding that there was sufficient evidence to convict McCrae for AWIKWA with respect to plainclothes officer who arrived on the scene where McCrae and five other gunmen went "with the intent to shoot anyone they saw there"). Appellants' argument as to Reyes–Mendoza is that no witness testified to an assault involving him. However, Bonilla testified that "Serrucho" also was shot at once or twice during this incident, and the government represents (and appellants have not disputed) that the prosecution's trial exhibits identify "Serrucho" as the nickname of Reyes–Mendoza.

Appellants Chávez and Morales next challenge their AWIKWA convictions

as to victims Roque Lopez (an STC member) and Brian Barger, a *Washington Post* reporter, who the evidence showed was driving his car in front of Lopez's car on October 27, 2002, when two cars carrying VL members made a U-turn to follow Lopez and began shooting at Lopez's car. Government witnesses Lopez, Barger and Javier Morales described the incident. No one testified that appellant Morales was on the scene, and he therefore argues that the evidence was insufficient to support his conviction as to these victims. However, from our review of the record we are satisfied that the evidence permitted the jury to convict appellant Morales of AWIKWA of Lopez and Barger on the basis of co-conspirator liability and transferred intent. *See Gordon,* 783 A.2d at 582; *Ruffin,* 642 A.2d at 1298.

Anaya testified that appellant Chávez told him that he was the one who shot at Lopez. Chávez argues, however, that the testimony about the circumstances of the shooting (*e.g.,* about a traffic jam on Sixteenth Street at night) "makes no sense." He also contends that the testimony about eight to nine shots having been fired at Lopez's car, with only one of the shots hitting the car, undermined the government's case, since the government portrayed Chávez as an experienced shooter. Chávez also urges that the evidence shows recklessness at most, not intent to kill. We reject these arguments because (1) it was up to the jury to determine the credibility of the testimony, and (2) if believed by the jury, the testimony was more than ample to prove that Chávez shot at Lopez, whom VL members had followed, with the intent to kill him (an intent transferable to Barger).

▬ All three appellants argue that the evidence was insufficient to convict them of AWIKWA of victims Hernandez and Pineda. Like second-degree-murder victim Lazo, Hernandez and Pineda were on the field at Roosevelt High School on October 29, 2002, when VL members opened fire on STC members. As already described, the government's evidence was that appellant Morales was one of the VL drivers who stayed with his car while appellants Chávez and Castillo went onto the field with guns. Urquilla testified that Chávez shot at Hernandez (and then shot and killed Lazo). Witnesses testified that Pineda was pursued by three or four shooters, one of whom was a man wearing a red jersey that a surveillance videotape showed was Chávez. This evidence sufficed to support Chávez's AWIKWA convictions. *Cf. Kidd v. United States,* 940 A.2d 118, 128 n. 12 (D.C.2007) ("Carrying a gun to the scene of the murder ... suggests that the defendant arrived on the scene with a preconceived plan to kill.") (citation omitted). Although Castillo's gun jammed and there was no evidence that Morales shot at anyone during the incident at Roosevelt, the evidence permitted the jury to convict both of AWIKWA as to Pineda and Hernandez as aiders and abettors or on the basis of co-conspirator liability.[14]

▬ Morales challenges his AWIKWA conviction as to victim Norwin Garcia on August 16, 2001. Garcia, a member of La Raza, testified that he was on a porch when a car carrying VL members, includ-

---

14. Castillo argues in addition that because Chávez was convicted of second-degree murder while armed of Lazo, the jury must have found that Chávez lacked the specific intent to kill, and that it was contradictory for the jury to attribute to Castillo such a specific intent as to Pineda and Hernandez. But, as already discussed, a second-degree-murder conviction can rest on either a specific intent to kill or on a conscious disregard of an extreme risk of death or serious bodily injury, *see Coleman,* 948 A.2d at 553, so there is no basis to assume that the jury found that Chávez lacked a specific intent to kill Lazo.

ing appellants Chávez and Morales, drove up and Chávez began shooting. Morales contends that the jury verdicts were contradictory, because (1) Garcia testified that appellant Chávez and another man (VL member Cabrito) were the shooters and that Morales was only the driver, but (2) the jury convicted Morales of AWIKWA as to Garcia (and of ADW as to co-victims Diaz and Lopez) while (3) it acquitted Chávez of AWIKWA as to Garcia (convicting him only of ADW as to all three victims). Leaving aside the issue of whether a true "contradiction" could provide a basis for disturbing the jury verdict, we see no contradiction here. For one thing, there was testimony from Lopez that he saw Morales shoot (and thus that Morales was not merely the driver), and the jury was free to credit his testimony. In addition, the evidence suggests a reason why the jury may have convicted Chávez of the lesser offense as to Garcia. Chávez testified that he began shooting only after one of the victims approached the VL car wielding a machete and that he shot toward that individual's hand "so he dropped the machete." Morales offered no such explanation, and, although Anaya testified that Morales did not shoot, Anaya also testified that Morales passed a gun to Cabrito even before any aggression began. Thus, the evidence permitted the jury to find Morales guilty of AWIKWA (victim Garcia) as either a principal or an aider and abettor.

## F. Felony Murder While Armed (Burglary)

■ Castillo challenges his conviction for the armed felony murder of STC member Ávila based on the predicate crime of first-degree burglary with the intent to commit assault. He argues that the government failed to prove that the burglary (of the apartment where Ávila was staying with the mother of Castillo's children) was undertaken with the specific intent to com-

mit an assault, and likewise failed to prove that Ávila's death occurred during the course of the burglary. We disagree. Government witnesses Vigil and Juan Carlos Morales testified that a group of VL members, including themselves and Castillo, decided to go to the apartment on Hawaii Avenue after looking in vain for STC members in the STC "territory" around 14th and Peabody Streets, and after Castillo said that he wanted to go to the apartment to see his children. Vigil also testified that along the way, he stopped to get his bat, and Juan Carlos Morales testified that Castillo had a gun in his waistband. The VL members went into the apartment carrying these weapons and Castillo pointed his gun at Ávila. This evidence allowed the jury to conclude that Castillo and his cohorts entered the apartment with the intent to commit an assault.

As the basis for his argument that there was no evidence that the murder occurred during the course of the burglary, Castillo points out that the government's witnesses testified that the burglars forced Ávila to go outside at gunpoint and that, once outside, Ávila broke free and ran, and Castillo ran after him and shot him. Castillo argues that this evidence shows that the burglary had already come to an end when, according to the government's evidence, the fatal shooting occurred. He urges that "the mere coincidence in time of [the predicate crime] and a murder is insufficient to support a felony murder conviction." *Head v. United States*, 451 A.2d 615, 625 (D.C. 1982) (citations omitted).

■ "The essential elements of felony murder while armed are that the defendant, while perpetrating or attempting to perpetrate a specified felony while armed, inflicted an injury on the victim from which he died." *Id.* (citations omitted). Thus, "[t]here must be evidence sufficient

to support a jury finding that the murder took place during the course of" the predicate crime of burglary. *Id.* (citations omitted). The government argues that this test was met because the burglary and the homicide were part of a continuous transaction and the evidence showed an " 'unbroken chain of facts and circumstances which link[ed]' the burglary ... and the homicide." *Marshall v. United States,* 623 A.2d 551, 558 (D.C.1992) (citation omitted). We agree with the government that the evidence permitted the jury to infer that the burglary was undertaken to enable the kidnaping, and that, in that sense, appellant was "still [attempting to] carry[ ] away the fruits of" the burglary when the shooting occurred. *Coleman,* 295 F.2d at 560; *cf. Carter v. United States,* 223 F.2d 332, 334 (D.C.Cir.1955) ("so long as the essential ingredient of asportation continues, the crime of robbery is still in progress ... with the result that the robber is guilty of first degree murder if in those circumstances he kills a pursuer"). The facts of this case are somewhat on par with those of *Carter,* in which the court upheld a conviction of felony murder (robbery) even though the evidence showed that the homicide occurred after Carter had "completely finished robbing" the victim and had left the immediate vicinity without being pursued. *Id.* Although "there was a slight interval between the time when Carter stole the money and the time when [the police officer whom Carter shot] began pursuing him," *id.,* "appellant had not secured to himself the fruits of the robbery, but was still feloniously carrying away the stolen money when [the police officer] began the chase." *Id.* Here, as in *Carter,* "it was for [the jury] to say whether [the predicate] crime was still in progress when the shooting occurred," *id.* at 335, and the "the chain of circumstances may well have seemed to the jury unbroken and continuous...." *Coleman,* 295 F.2d at 558.

## G. Obstruction

■ Castillo was convicted of obstruction of justice [15] on the basis of statements he made regarding expected testimony by government witness Mauro Delcid. Anaya testified that, while in a courthouse holding cell on one of appellants' scheduled court dates, he was present during a discussion of "snitching." Juan Morales told the group of VL members that Delcid was cooperating with the government and Castillo responded that he "was not going to let" Delcid do that. Castillo argues that the testimony about this statement was insufficient to sustain his obstruction conviction. We disagree.

Courts have recognized that, for purposes of obstruction of justice, the "objective standard for evaluating whether a statement constitutes a threat ... is whether the statement has a reasonable tendency to intimidate, ... that is, whether the defendant's statement is actually an expression of intention to inflict evil, injury, or damage on another." *United States v. England,* 507 F.3d 581, 589 (7th Cir. 2007) (citation and quotation marks omitted). Whether that test is met depends upon the statement and the context in which it was made. *See United States v. Young,* No. 08–5021, 2009 WL 2196852, at *1, 2009 U.S.App. LEXIS 16379, at *3 (4th Cir. July 24, 2009) (per curiam) (where defendant "yelled at a cooperating witness in the courthouse lock-up in the presence of other prisoners and called the cooperating witness a 'snitch' and a 'rat,'" his

---

15. *See* D.C.Code § 22–722(a)(6) (2001 & 2009 Supp.) ("providing that a person commits the offense of obstruction of justice if he [c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding").

"statements and the context in which they were made establish[ed] his intent to, directly or indirectly, intimidate or unlawfully influence the cooperating witness" and enabled the court properly to conclude that he intended to obstruct justice). Here, the evidence was that Castillo made his statement during a discussion (of Delcid's activities) in which appellant Chávez responded that he would put a bullet in Delcid's head or in the head of anyone who snitched. Given the context of Castillo's statement about not letting Delcid cooperate with the government, we agree with the government that there was sufficient evidence from which the jury could infer that Castillo endeavored to obstruct justice by intimidating anyone who heard his statement (or who heard of his statement) from testifying for the government. It was not necessary for the government to prove that Castillo actually succeeded in preventing any witness from testifying. *See McBride v. United States,* 393 A.2d 123, 131 (D.C.1978) (explaining that the obstruction statute does not require that obstructing statements or threats of harm be directly addressed to the allegedly intimidated witnesses, and statements that "could have a tendency to influence or intimidate those who heard the statements . . . can constitute obstruction").

### III. Severance

■■■■ Appellants Castillo and Morales argue that the trial court erred in denying their motions for trials separate from those of their co-defendants. "We will reverse the trial court's decision denying a motion for severance only upon a clear showing that it has abused its considerable discretion." [16] *Moore v. United States,* 927 A.2d 1040, 1056 (D.C.2007)

(quoting *Sterling v. United States,* 691 A.2d 126, 135 (D.C.1997)). A defendant seeking reversal on this basis bears the burden of demonstrating that, as to him, joinder was "manifestly prejudicial." *McAdoo,* 515 A.2d at 420 (quoting *Christian v. United States,* 394 A.2d 1, 20 (D.C. 1978) (per curiam)). We have recognized that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citation omitted); *Bush v. United States,* 516 A.2d 186, 192 (D.C.1986) (observing that "[m]anifest prejudice occurs . . . where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants") (citation omitted).

Castillo emphasizes that he was not charged in a majority of the acts in the indictment and that the first overt act he was charged with occurred on October 29, 2002 (while his co-defendants were charged with 53 overt acts before that date). He argues that the prejudice to him from joinder outweighed any judicial economy achieved by trying the co-defendants together. *See Void v. United States,* 631 A.2d 374, 379 (D.C.1993). He also argues that the (almost two-month) length of the trial contributed to the high risk of jury confusion. Morales argues that he was prejudiced by the spillover effect of evidence that related only to his co-defendants' conduct.

■■■ We are not persuaded by appellants' prejudice arguments. Because the government charged each of the appellants

---

16. Under Super. Ct.Crim. R. 14, the trial court has discretionary authority to "grant a severance of defendants or provide whatever other relief justice requires" where "it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together[.]"

with conspiracy as well as with individual substantive offenses, appellants are incorrect in arguing that evidence that pertained to their co-defendants did not pertain to them or had only an improper spillover effect. "In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged." *Holmes v. United States*, 580 A.2d 1259, 1268 (D.C.1990) (quoting *Nye & Nissen v. United States*, 168 F.2d 846, 857 (9th Cir.1948)) (quotation marks and other citations omitted). As the government points out, even in separate trials, in light of the conspiracy charge against each appellant, much of the evidence of each appellant's co-conspirators' conduct could have been introduced. In addition, we see no indication that the evidence was too unwieldy for the jury to keep straight or that jurors were unable to make individual determinations about each appellant's guilt or innocence as to the substantive offenses with which each was charged. The government presented its evidence incident by incident, having witnesses return to the stand multiple times to offer their testimony as to particular incidents and their participants, rather than having each witness testify at one sitting to all incidents of which he had knowledge. The court instructed the jury to consider each offense and the evidence that applied to it separately. Moreover, the jury deliberated at length, and while it convicted each appellant of multiple offenses, it also acquitted each appellant of several charges, with results for each appellant that seem rational based on the evidence presented. In short, we cannot agree that any prejudice from joinder outweighed the judicial economy achieved by trying the co-defendants together, so as to overcome the presumption in favor of joinder. *See Moore*, 927 A.2d at 1056.

## IV. "Other Crimes" Evidence

■ Finally, Castillo argues that the trial court erred by permitting the government to introduce evidence of his participation in crimes with which he was not charged. For example, the government elicited testimony from Anaya and from Manuel Chávez that Castillo was the driver of the car that carried the VL members who shot Gonzalez and participated in the shooting, and that Castillo shot at first-degree-murder victim Villatoro, even though Castillo was not charged in the murder of either victim. Castillo contends that the trial court erred in admitting such testimony without having made a finding about the admissibility of such evidence under *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964). He also faults the trial court for failing to give a cautionary instruction about this "propensity"-type evidence.

As the government notes, however, Castillo did not object to the testimony on the ground he now cites and did not seek a cautionary instruction. Accordingly, we review his claim only for plain error. We are satisfied that there was no plain error. In the first place, *Drew* evidence is evidence that is independent of the crime charged. *See Johnson v. United States*, 683 A.2d 1087, 1096 (D.C.1996) (en banc). By contrast, the evidence in question was direct proof of the charged crime of conspiracy. *See United States v. Mathis*, 216 F.3d 18, 26 (D.C.Cir.2000) ("In a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.") (citation and internal quotation marks omitted). In addition, it can hardly be "plain" that admission of evidence of a

defendant's "other bad acts" that are related to a charged conspiracy, but with which the defendant has not been charged as substantive offenses, is erroneous, since this court has not decided "whether ... the trial judge's broad discretion with respect to the reception of evidence in a conspiracy case would justify the admission of presumptively prejudicial proof of other bad acts." *Holmes*, 580 A.2d at 1269.

## V. Conclusion

For the reasons discussed, as to appellants Morales and Chávez, we reverse the convictions for AAWA (victim Diaz) and remand for entry of judgment on the lesser-included offense of ADW. For all three appellants, the remaining judgments of conviction are affirmed.

*So ordered.*